

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-22-1998

# Ford v. Schering Plough Corp

Precedential or Non-Precedential:

Docket 96-5674

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Ford v. Schering Plough Corp" (1998). *1998 Decisions.* Paper 118.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/118

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 22, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5674

COLLEEN V. FORD,
        Appellant

v.

SCHERING-PLOUGH CORPORATION;
SCHERING CORPORATION;
METROPOLITAN LIFE INSURANCE COMPANY

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 96-cv-01991)

Argued January 28, 1998

BEFORE: MANSMANN, COWEN and ALITO, Circuit Judges

(Filed May 22, 1998)

        Maureen S. Binetti, Esq. (Argued)
        Wilentz, Goldman & Spitzer
        90 Woodbridge Center Drive
        P.O. Box 10
        Woodbridge, NJ 07095

         Counsel for Appellant
         Colleen V. Ford

Robert J. Gregory, Esq.
 (Argued)
Room 7032
Equal Employment Opportunity
 Commission
1801 L Street, N.W.
Washington, DC 20507

 Counsel for Amicus-Appellant
 Equal Employment Opportunity
 Commission

Corrie L. Fischel, Esq.
McGuiness & Williams
1015 15th Street, N.W.
Suite 1200
Washington, DC 20005

 Counsel for Amicus-Appellee
 Equal Employment Advisory
 Council

Patricia A. Dunn, Esq.
Jones, Day, Reavis & Pogue
1450 G Street, N.W.
Suite 700
Washington, DC 20005-2088

 Counsel for Amicus-Appellee
 American Council Life Insurance

Ronald S. Cooper, Esq.
Steptoe & Johnson
1330 Connecticut Avenue, N.W.
Washington, DC 20036

Counsel for Amicus-Appellee
Association of Private Pension
And Welfare Plans
Blue Cross and Blue Shield
Association

Thomas F. Campion, Esq. (Argued)
Lee E. Miller

2

Shanley & Fisher
131 Madison Avenue
Morristown, NJ 07962-1979

 Counsel for Appellee
 Schering Plough Corporation

Allen I. Fagin
Aaron J. Schindel
Ronald S. Rauchberg
Proskauer, Rose, Goetz &
 Mendelsohn
1585 Broadway
New York, NY 10036

Allan M. Marcus, Esq. (Argued)
Metropolitan Life Insurance
 Company
Law Department
One Madison Avenue
New York, NY 10010-3690

Sondra M. Hirsch, Esq.
Metropolitan Life Insurance
 Company
One Meadowlands Plaza
1st Floor
East Rutherford, NJ 07073

 Counsel for Appellee
 Metropolitan Life Insurance
 Company

OPINION OF THE COURT

COWEN, Circuit Judge.

This appeal presents the purely legal question of whether a disparity between disability benefits for mental and physical disabilities violates the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. S 12101 et  seq. (1994). The plaintiff-appellant, Colleen Ford, sued her employer, Schering-Plough Corporation (Schering), and the carrier of

3

Schering's group insurance policy, Metropolitan Life Insurance Company (MetLife), alleging that the two-year cap applicable to benefits for mental disabilities, but not for physical disabilities, violates the ADA. On September 12, 1996, the District Court for the District of New Jersey granted the defendants' motion to dismiss Ford's complaint under Federal Rule of Civil Procedure 12(b)(6). Ford appealed. We will affirm the order of the district court dismissing Ford's complaint even though we differ with the district court by finding Ford eligible to file suit under Title I of the ADA.

I.

The facts concerning the plaintiff's employment and her disability are not in dispute. Ford was an employee of Schering from 1975 until May of 1992, when she became disabled by virtue of a mental disorder and was unable to continue her employment. While she served as an employee, Ford enrolled in the employee welfare benefits plan offered by Schering through MetLife. The plan provided that benefits for physical disabilities would continue until the disabled employee reached age sixty-five so long as the physical disability persisted. Regarding mental disabilities, however, the plan mandated that benefits cease after two years if the disabled employee was not hospitalized. Ford found herself in this latter category, suffering from a mental disorder yet not hospitalized and thus ineligible for a continuation of her benefits past the two-year limit. Her benefits expired on Nov. 23, 1994.

Ford filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). The EEOC issued her a "right-to-sue" letter on January 31, 1996. Subsequently, Ford filed a three-count complaint against Schering and MetLife alleging discrimination in violation of the ADA. The defendants filed motions to dismiss the complaint pursuant to Rule 12(b)(6) and, in the alternative, for summary judgment. The district court granted the defendants' Rule 12(b)(6) motion, dismissing the complaint for failure to state a claim. This appeal followed.

4

II.

We have jurisdiction under 28 U.S.C. S 1291 (1994), and our review over the district court's order is plenary. When considering a Rule 12(b)(6) motion, we accept as true all the allegations set forth in the complaint, and we must draw all reasonable inferences in the plaintiff's favor. See Schrob v. Catterson, 948 F.2d 1402, 1405 (3d Cir. 1991). Dismissal of a plaintiff's claim under Rule 12(b)(6) occurs only if the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957).

III.

Because the facts of this case are not in dispute, our analysis focuses on the legal question of whether the disparity between mental and physical disability benefits violates the ADA and, as a preliminary issue, whether Ford is even eligible to sue under the ADA. We will address Ford's claims under Titles I and III seriatim.

A.

Ford's first claim alleges that the defendants' group insurance plan violates Title I of the ADA because of the disparity in benefits between mental and physical disabilities. Title I of the ADA proscribes discrimination in the terms and conditions of employment and mandates in relevant part:

> (a) General rule
>
> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.
>
> (b) Construction
>
> As used in subsection (a) of this section, the term "discriminate" includes--

5

. . . .

> (2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with . . . an organization providing fringe benefits to an employee of the covered entity[)] . . . .

42 U.S.C. S 12112(a)-(b) (emphasis added). As the plaintiff correctly observes, the defendants' group insurance plan is a fringe benefit of employment at Schering. Ford claims that the defendants violated Title I of the ADA because the mental-physical disparity constitutes discrimination against her on the basis of her disability.

i.

Before addressing the merits of Ford's Title I claim, we must first ascertain whether Ford is eligible tofile suit under Title I. While the district court held that Ford lacked "standing[,]" Dist. Ct. Op. at 7, the question of standing is not at issue in this case. Indeed, Ford has been"injured in fact" by the denial of her benefits, which is"an injury to [herself] that is likely to be redressed by a favorable decision." Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 38, 96 S. Ct. 1917, 1924 (1976). Furthermore, Ford's interest is arguably within the zone of interests regulated by the ADA. See id. at 39 n.19, 96 S. Ct. at 1925 n.19. Instead of ascertaining Ford's standing, we must assess Ford's eligibility under the ADA's requirements to file suit.

Title I of the ADA restricts the ability to sue under its provisions to a "qualified individual with a disability[,]" whose characteristics are defined as follows:

> The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of

6

this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. S 12111(8). Thus, an individual eligible to sue under Title I of the ADA must be disabled but still able to perform his or her job duties with or without a reasonable accommodation by the employer. Ford, however, admits that she is currently unable to work even with a reasonable accommodation. Indeed, her disabled status is the reason for her desire to receive the disability benefits at issue here.

The defendants-appellees argue that Ford is clearly ineligible to sue under Title I of the ADA because she is currently disabled, and they point to our recent statement that "a person unable to work is not intended to be, and is not, covered by the ADA." McNemar v. Disney Store, Inc., 91 F.3d 610, 618 (3d Cir. 1996), cert. denied, ___ U.S. ___, 117 S. Ct. 958 (1997). McNemar focused on whether an individual is judicially estopped from claiming to be a "qualified individual with a disability" when he represented to governmental agencies that he was completely disabled. In McNemar, an HIV-positive man represented to government agencies that he was completely disabled for the purpose of receiving disability benefits. At the same time, he asserted that he was a "qualified individual with a disability[,]" meaning that he could work with or without a reasonable accommodation, in his suit against his former employer under the ADA for wrongful discharge. As a result, we concluded that the district court was within its discretion in finding that McNemar's representations to government agencies estopped him from claiming that he was a "qualified individual with a disability" under Title I. See id. at 617-18.

At first glance, McNemar seems to cover the instant case since Ford has asserted she is completely disabled for purposes of disability benefits yet is now asserting she is a "qualified individual with a disability" for purposes of her ADA suit. However, despite its apparent relevance, McNemar is distinguishable. In McNemar, the plaintiff's

7

situation vis-a-vis the ADA did not give rise to the possibility that, for reasons intrinsic to the ADA, there was an ambiguity in the definition of "qualified individual with a disability[.]" The essence of McNemar's suit was that he could still work despite his disability (meaning that he was wrongfully discharged), yet he simultaneously received benefits for being unable to work due to his disability. McNemar's situation did not unearth an internal contradiction in the ADA; instead, the contradiction in McNemar's position arose between McNemar's various representations, namely his claim of wrongful discharge and his assertion to government agencies that he was completely disabled.

In the instant case, Ford is also attempting to qualify under Title I's eligibility requirement, but the factual predicate of her claim (that she is disabled and deserving of disability benefits) matches the representation she made to qualify for the benefits she already received. Unlike the McNemar plaintiff, Ford illuminates an internal contradiction in the ADA itself, namely the disjunction between the ADA's definition of "qualified individual with a disability" and the rights that the ADA confers. Title I of the ADA prohibits discrimination by employers regarding the "terms, conditions, and privileges" of employment, 42 U.S.C. S 12112(a), including "fringe benefits" such as disability benefits. Id. S 12112(b)(2). Yet, as Ford and the EEOC as amicus argue, restricting eligibility to sue under Title I to individuals who can currently work with or without a reasonable accommodation prevents disabled former employees from suing regarding discrimination in disability benefits. Once an individual becomes disabled and thus eligible for disability benefits, that individual loses the ability to sue under a strict reading of Title I's definition of "qualified individual with a disability" because that individual can no longer work with or without a reasonable accommodation. In order for the rights guaranteed by Title I to be fully effectuated, the definition of "qualified individual with a disability" would have to permit suits under Title I by more than just individuals who are currently able to work with or without reasonable accommodations.

8

This disjunction between the explicit rights created by Title I of the ADA and the ostensible eligibility standards for filing suit under Title I causes us to view the contents of those requirements as ambiguous rather than as having an unassailable plain meaning. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., ___ U.S. ___, ___, 117 S. Ct. 843, 846 (1997) (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 477, 112 S. Ct. 2589, 2594-95 (1992), and McCarthy v. Bronson, 500 U.S. 136, 139, 111 S. Ct. 1737, 1740 (1991)). The locus of the ambiguity is whether the ADA contains a temporal qualifier of the term "qualified individual with a disability[.]" If the putative plaintiff must, at the time of the suit, be employable with or without a reasonable accommodation, then a disabled former employee loses his ability to sue to challenge discriminatory disability benefits. Alternatively, the term "qualified individual with a disability" may include former employees who were once employed with or without reasonable accommodations yet who, at the time of suit, are completely disabled.

The Supreme Court's recent decision in Robinson, which concerned the scope of Title VII of the Civil Rights Act of 1964, 42 U.S.C. S 2000e et seq. (1994), contributes to this ambiguity by lending support for interpreting Title I of the ADA to permit suits by disabled individuals against their former employers concerning their disability benefits. Cases interpreting Title VII are relevant to our analysis of the ADA because the ADA is essentially a sibling statute of Title VII. Indeed, the ADA's accompanying House report states that the purpose of the ADA is "to provide civil rights protections for persons with disabilities that are parallel to those available to minorities and women." H.R. Rep. No. 101-485, pt. 3, at 48 (1990), reprinted in 1990 U.S.C.C.A.N. 267, 471. Furthermore, the ADA incorporates by reference several terms defined in Title VII. See 42 U.S.C. S 12111(7) (incorporating Title VII's definitions of "person", "labor organization", etc.).

In Robinson, the Supreme Court analyzed whether former employees are allowed to bring suits against their previous

9

employers under Title VII for post-termination retaliation such as negative job references. The Court found that the term "employees" as used in S 704(a) of Title VII was ambiguous regarding its temporal reach, i.e., whether it covered only current employees or encompassed former employees as well. See ___ U.S. at ___, 117 S. Ct. at 846-48. Resolving this ambiguity, the Court held that the term encompassed former employees in order to provide former employees with a legal recourse against post-termination retaliation. See id. at ___, 117 S. Ct. at 848-49; see also Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 200 (3d Cir. 1994) (former employee may file a retaliation claim against a former employer under Title VII).

As with the term "employees" in Title VII, the ADA contains an ambiguity concerning the definition of "qualified individual with a disability" because there is no temporal qualifier for that definition. Congress could have restricted the eligibility for plaintiffs under the ADA to current employees or could have explicitly broadened the eligibility to include former employees. Since Congress did neither but still created rights regarding disability benefits, we are left with an ambiguity in the text of the statute regarding eligibility to sue under Title I.

We resolve this ambiguity by interpreting Title I of the ADA to allow disabled former employees to sue their former employers regarding their disability benefits so as to effectuate the full panoply of rights guaranteed by the ADA. This is in keeping with the ADA's rationale, namely "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities . . . [and] to provide clear, strong, consistent, enforceable standards addressing [such] discrimination . . . ." 42 U.S.C. S 12101(b)(1)-(2) (emphasis added). Our decision is also in keeping with the Supreme Court's Robinson decision, which found that the temporal reach of Title VII encompasses former employees, and our pre-Robinson decision to that effect in Charlton, 25 F.3d at 200.

By adopting this interpretation, we part ways with the Seventh and Eleventh Circuits, both of which tendered decisions prior to Robinson.1 In EEOC v. CNA Ins.

_____

1. The Sixth Circuit in Parker v. Metropolitan Life Ins. Co., 99 F.3d 181 (6th Cir. 1996), analyzed whether a plaintiff was eligible to sue under

10

Companies, 96 F.3d 1039 (7th Cir. 1996), the Seventh
Circuit rejected the suit of an individual in a position
similar to Ford's. Litigating on behalf of the former
employee, the EEOC argued that the individual was eligible
to sue under Title I by arguing that an analogy may be
drawn to decisions allowing former employees to sue
employers for retaliation under Title VII. The Seventh
Circuit rejected this argument by noting that no
discrimination against the plaintiff occurred during her
employment, while, in the Title VII retaliation situation,
actual harm occurred by virtue of the retaliation. As the
Seventh Circuit wrote, "[N]othing happened that
discriminated against her during the time she was working
at CNA. The only thing that occurred was CNA's 1985
decision to reduce the long-term benefits available to all of
its employees for mental health problems." Id. at 1045.
However, the Seventh Circuit's brief analysis conflates two
issues, the first being whether the individual could sue
regarding fringe benefits while completely disabled, and the
second being whether the individual's suit had merit and
was based upon actual discrimination. The Seventh Circuit
essentially declined to find the individual eligible to sue
because her suit lacked merit. Therefore, we do notfind the
Seventh Circuit's reasoning persuasive regarding whether
Ford is eligible to sue in the instant case as opposed to
whether her suit has merit.2

_____

Title I. However, that decision was vacated by the granting of the
plaintiff's petition for rehearing en banc. See 6th Cir. R. 14(a). The en
banc decision did not address the Title I issue because it was not raised
by the plaintiff's petition for rehearing en banc. See Parker v.
Metropolitan Life Ins. Co., 121 F.3d 1006, 1009 n.2 (6th Cir. 1997) (en
banc), cert. denied, ___ U.S. ___, 118 S. Ct. 871 (1998).

2. The EEOC also argued in CNA that the disabled person was in the
"employment position" of "disability benefit recipient." Id. at 1043
(internal quotation marks omitted). According to the Seventh Circuit, the
EEOC claimed that, "[b]ecause CNA imposes no job-related duties on any
of the beneficiaries of its long-term disability plan, [the plaintiff] by
definition can perform the essential functions of her position: there are
none . . . ." Id. at 1043-44. The Seventh Circuit rejected that argument
because, in its words, "[a]n `employment position' is a job[,]" id. at
1044,
meaning that receiving disability benefits did not qualify as an
employment position. However, Ford does not offer this argument in the
instant litigation.

11

We also disagree with the Eleventh Circuit's ruling in Gonzales v. Garner Food Services, Inc., 89 F.3d 1523 (11th Cir. 1996). In Gonzales, as in the instant case, a disabled former employee sued his former employer under the ADA regarding alleged discrimination in disability benefits. The Eleventh Circuit recognized the possible analogy between the Title VII retaliation context and the ADA situation, but it refused to adopt this analogy and to grant the plaintiff permission to sue. Instead, the Eleventh Circuit argued that, "[a]bsent clearly expressed legislative intent to the contrary, the plain language of the statute should be conclusive." Id. at 1528. The Eleventh Circuit concentrated on what it believed to be the plain meaning of the ADA, that only currently employable individuals could sue. However, it failed to address the possibility that the disparity between the rights created by the ADA and the apparent legal remedy fashioned by the ADA creates an ambiguity in the eligibility requirements for obtaining a remedy.

In sum, we respectfully disagree with the district court and sister courts of appeals. We find that Title I of the ADA does permit disabled individuals to sue their former employers regarding their disability benefits. We reach this conclusion because the ADA's proscription of discrimination in fringe benefits generates the need for disabled individuals to have legal recourse against such discrimination and exposes the temporal ambiguity in the ADA's definition of "qualified individual with a disability[.]" We resolve this ambiguity in favor of a broad temporal interpretation of "qualified individual with a disability[,]" that disabled former employees, no longer able to work with or without reasonable accommodations, can sue their former employers concerning alleged discrimination in their package of disability benefits. Our impetus for this conclusion also comes from the Supreme Court's Robinson decision allowing former employees to sue under Title VII of the Civil Rights Act of 1964.

ii.

Having established Ford's eligibility to sue under Title I, we must now ascertain whether she states a claim that survives the defendants' Rule 12(b)(6) motion. Ford

essentially claims that the disparity between benefits for mental and physical disabilities violates Title I of the ADA. However, Ford's argument does not support a finding of discrimination under Title I.

While the defendants' insurance plan differentiated between types of disabilities, this is a far cry from a specific disabled employee facing differential treatment due to her disability. Every Schering employee had the opportunity to join the same plan with the same schedule of coverage, meaning that every Schering employee received equal treatment. So long as every employee is offered the same plan regardless of that employee's contemporary or future disability status, then no discrimination has occurred even if the plan offers different coverage for various disabilities. The ADA does not require equal coverage for every type of disability; such a requirement, if it existed, would destabilize the insurance industry in a manner definitely not intended by Congress when passing the ADA.

This analysis is supported by Supreme Court and Third Circuit precedent concerning the Rehabilitation Act of 1973, 29 U.S.C. S 794 (1994), to which we may look for guidance in interpreting the ADA. See Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998). In Alexander v. Choate, 469 U.S. 287, 105 S. Ct. 712 (1985), plaintiffs sued in response to the Tennessee Medicaid program's reduction in the number of inpatient hospital days for which it would pay. The plaintiffs claimed that the reduction would have a disproportionate effect on handicapped individuals since they would require longer inpatient care than non-handicapped individuals. However, the Supreme Court held that the limit on inpatient hospital care was "neutral on its face[ ]" and did not "distinguish between those whose coverage will be reduced and those whose coverage will not on the basis of any test, judgment, or trait that the handicapped as a class are less capable of meeting or less likely of having." Id. at 302, 105 S. Ct. at 720-21. According to the Supreme Court, handicapped citizens did not suffer from discrimination because both handicapped and non-handicapped individuals were "subject to the same durational limitation." Id. at 302, 105 S. Ct. at 721.

13

Building on Alexander, the Supreme Court in Traynor v. Turnage, 485 U.S. 535, 108 S. Ct. 1372 (1988), dismissed a challenge to a federal statute precluding the Veterans Administration from granting extensions to a ten-year delimiting period for veterans to claim their benefits if the veterans' disabilities arose from their own willful misconduct, defined by regulations as including alcoholism. The Supreme Court rejected the argument that the statute discriminated against one type of disability, namely alcoholism. "There is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons." Id. at 549, 108 S. Ct. at 1382.

We have likewise held, in the context of the Rehabilitation Act, that a state's medical assistance statute need not treat every disability equally. In Doe v. Colautti, 592 F.2d 704 (3d Cir. 1979), we dismissed a challenge to a Pennsylvania statute that provided unlimited hospitalization for physical illness in a private hospital but restricted hospitalization for mental illness in private mental hospitals. We rejected the argument that the differential level of benefits violated the Rehabilitation Act by noting that, "[i]n the treatment of their physical illnesses, the mentally ill receive the same benefits as everyone else. A mental patient with heart disease, for instance, is as entitled to benefits for treatment of the heart disease as would be a person not mentally ill." Id. at 708. Our holding in Doe is supported by the D.C. Circuit's decision in Modderno v. King, 82 F.3d 1059 (D.C. Cir. 1996), cert. denied, ___ U.S. ___, 117 S. Ct. 772 (1997), in which the D.C. Circuit rejected a challenge brought by a former spouse of a foreign service officer against the Foreign Service Benefit Plan under the Rehabilitation Act based upon the plan's lower level of benefits for mental illness as compared to physical illness.

Aside from Supreme Court and Third Circuit precedent in the Rehabilitation Act context, claims under the ADA similar to Ford's have been rejected by three courts of appeals in published opinions. While we disagree with the Seventh Circuit's reasoning in CNA regarding the plaintiff's

14

eligibility to sue, we agree with its discussion regarding the merits of the plaintiff's claim. In rejecting the plaintiff's challenge to the disparity between benefits for mental and physical illnesses, the Seventh Circuit stated:

> One of those terms, conditions, or privileges of employment may be a pension plan, but there is no claim here that CNA discriminated on the basis of disability in offering its pension plan to anyone. It did not charge higher prices to disabled people, on the theory that they might require more in benefits. Nor did it vary the terms of its plan depending on whether or not the employee was disabled. All employees--the perfectly healthy, the physically disabled, and the mentally disabled--had a plan that promised them long-term benefits from the onset of disability until age 65 if their problem was physical, and long-term benefits for two years if the problem was mental or nervous. . . .
>
> [The plaintiff] raises a different kind of discrimination claim, more grist for the ERISA mill or the national health care debate than for the ADA. She claims that the plan discriminates against employees who in the future will become disabled due to mental conditions rather than physical conditions; their present dollars (unbeknownst to them) are buying only 24 months of benefits, instead of benefits lasting much longer. However this is dressed up, it is really a claim that benefit plans themselves may not treat mental health conditions less favorably than they treat physical health conditions. Without far stronger language in the ADA supporting this result, we are loath to read into it a rule that has been the subject of vigorous, sometimes contentious, national debate for the last several years. Few, if any, mental health advocates have thought that the result they would like to see has been there all along in the ADA.

CNA, 96 F.3d at 1044 (citations omitted). Likewise, in Krauel v. Iowa Methodist Med. Ctr., 95 F.3d 674 (8th Cir. 1996), the Eighth Circuit rejected a challenge under the ADA to an insurance plan that denied coverage for infertility. Analogizing the infertility exclusion to differential

15

benefits for mental and physical illnesses, the Eighth Circuit stated, "Insurance distinctions that apply equally to all insured employees, that is, to individuals with disabilities and to those who are not disabled, do not discriminate on the basis of disability." Id. at 678. Finally, the Sixth Circuit in Parker rejected a claim similar to Ford's made against the same defendants as in the instant case. As the Sixth Circuit held, "Because all the employees at Schering-Plough, whether disabled or not, received the same access to the long-term disability plan, neither the defendants nor the plan discriminated between the disabled and the able bodied." 121 F.3d at 1015-16; cf . Brennen v. Comptroller of the State of N.Y., 100 F.3d 942, 1996 WL 19057 (2d Cir. 1996) (unpublished table decision) (benefits extended to one category of disabled persons need not be extended to all other categories).

The cases finding no violation of the ADA by a disparity in benefits between mental and physical disabilities are supported by the ADA's legislative history. As the Senate Labor and Human Resources Committee report states:

> In addition, employers may not deny health insurance coverage completely to an individual based on the person's diagnosis or disability. For example, while it is permissible for an employer to offer insurance policies that limit coverage for certain procedures or treatments, e.g., only a specified amount per year for mental health coverage, a person who has a mental health condition may not be denied coverage for other conditions such as for a broken leg or for heart surgery because of the existence of the mental health condition. A limitation may be placed on reimbursements for a procedure or the types of drugs or procedures covered[,] e.g., a limit on the number of x-rays or non-coverage of experimental drugs or procedures; but, that limitation must apply to persons with or without disabilities. All people with disabilities must have equal access to the health insurance coverage that is provided by the employer to all employees.

S. Rep. No. 101-116, at 29 (1989).

16

In addition, legislative history subsequent to the ADA's passage evinces that Congress did not believe that the ADA mandated parity between mental and physical disability benefits. In 1996, the Senate defeated an amendment to the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (1996) (codified primarily in Titles 18, 26 and 42 of the U.S. Code), which would have mandated parity in insurance coverage for mental and physical illnesses. Such an amendment would have been unnecessary altogether if the ADA already required such parity. See 142 Cong. Rec. S9477-02 (daily ed. Aug. 2, 1996) (statement of Sen. Heflin); see also CNA, 96 F.3d at 1044. Furthermore, Congress then passed the Mental Health Parity Act of 1996, Pub. L. No. 104-204, Title VII, 110 Stat. 2944 (1996) (codified at 29 U.S.C.S 1185a and 42 U.S.C. S 300gg-5), which mandates, inter alia, that a health insurance plan containing no annual or lifetime limit for medical benefits cannot have such limits on mental health. Such congressional action reveals both that the ADA does not contain parity requirements and that no parity requirements for mental and physical disability benefits have been enacted subsequent to the ADA.

iii.

Ford attempts to buttress her challenge to the disparity between benefits for mental and physical disabilities by pointing to section 501(c) of the ADA, which contains the "safe harbor" provision covering the insurance industry. This section, codified at 42 U.S.C. S 12201(c), reads as follows:

> (c) Insurance
>
> Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict --
>
> (1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

17

> (2) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or
>
> (3) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance.
>
> Paragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the purposes of subchapter [sic] I and III of this chapter.

42 U.S.C. S 12201(c). Ford essentially claims that, once she presents a prima facie case alleging discrimination in disability benefits, Schering and MetLife must present actuarial data demonstrating that their plan is not a "subterfuge[.]" Hence, according to Ford, the district court erred in granting the defendants' Rule 12(b)(6) motion since the defendants had not offered data justifying the actuarial basis for the disparity in benefits.

Ford's argument must fail, however, since it runs contrary to Supreme Court precedent, ignores our statutory duty regarding insurance regulation and distorts the role of this court. First, Ford's argument that Schering and MetLife must justify their insurance plan contradicts the Supreme Court's interpretation of a provision similar to section 501(c) in the context of the Age Discrimination in Employment Act (ADEA), Pub. L. No. 90-202, 81 Stat. 602 (1967) (codified at 29 U.S.C. S 621 et seq. (1994)). Prior to Congress's elimination of the term "subterfuge" from the ADEA in 1990, see Older Workers Benefit Protection Act of 1990, Pub. L. No. 101-433, 104 Stat. 978, the ADEA granted an exemption from the ADEA's prohibition of age discrimination to an employee benefit plan that was not "a subterfuge[.]" 29 U.S.C. S 623(f) (1988). In Public Employees Retirement Sys. of Ohio v. Betts, 492 U.S. 158, 109 S. Ct. 2854 (1989), the Supreme Court rejected a challenge to an insurance plan that rendered covered employees ineligible

18

for disability retirement once they reached age sixty. Relying on its decision in United Air Lines, Inc. v. McMann, 434 U.S. 192, 98 S. Ct. 444 (1977), the Supreme Court concluded that the term "subterfuge" must be given its ordinary meaning of " `a scheme, plan, stratagem, or artifice of evasion.' " Betts, 492 U.S. at 167, 109 S. Ct. at 2861 (quoting McMann, 434 U.S. at 203, 98 S. Ct. at 450). In addition, the Supreme Court found that requiring an insurance company to justify its coverage scheme had no basis in the statutory language. See id. at 170–71, 109 S. Ct. at 2863; see also McMann, 434 U.S. at 203, 98 S. Ct. at 450.

The Supreme Court's definition and analysis of the ADEA's use of the term "subterfuge" are applicable to the ADA's use of the term "subterfuge[.]" Congress enacted section 501(c) of the ADA in 1990, see Pub. L. No. 101–336, 104 Stat. 369 (1990), while the Supreme Court decided Betts in 1989. Congress therefore is presumed to have adopted the Supreme Court's interpretation of "subterfuge" in the ADEA context when Congress enacted the ADA. "[W]here, as here, Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." Lorillard v. Pons, 434 U.S. 575, 581, 98 S. Ct. 866, 870 (1978); see Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 59, 31 S. Ct. 502, 515 (1911) ("[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense unless the context compels to the contrary."). "Had Congress intended to reject the Betts interpretation of subterfuge when it enacted the ADA, it could have done so expressly by incorporating language for that purpose into the bill that Congress voted on and the President signed." Krauel, 95 F.3d at 679; accord Modderno, 82 F.3d at 1064. Accordingly, as the Supreme Court held in the ADEA context, the term "subterfuge" does not require an insurance company to justify its policy coverage after a plaintiff's mere prima facie allegation.

The second reason that Ford's argument must fail is that it ignores our statutory duty under the McCarran–Ferguson

Act regarding insurance cases. Pursuant to that Act, "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance . . . ." 15 U.S.C. S 1012(b) (1994). The ADA does not "specifically relate[ ] to the business of insurance[,]" id., and does not mention the term "insurance" in its introductory section entitled "Findings and purpose[.]" See 42 U.S.C. S 12101. Accordingly, we will not construe section 501(c) to require a seismic shift in the insurance business, namely requiring insurers to justify their coverage plans in court after a mere allegation by a plaintiff. This second reason is integrally related to the third reason Ford's argument regarding section 501(c) fails, namely that requiring insurers to justify their coverage plans elevates this court to the position of super-actuary. This court is clearly not equipped to become the watchdog of the insurance business, and it is unclear exactly what actuarial analysis the defendants would have to produce to disprove the charge of "subterfuge[.]" See Modderno, 82 F.3d at 1062-63 (noting confusion as to exactly what actuarial data would be sufficient).

B.

Ford's second claim against Schering and MetLife is that the disparity in benefits for mental and physical disabilities violates Title III of the ADA. Title III reads in relevant part as follows: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. S 12182(a). Relying on the principle that courts should avoid interpreting statutes in a manner rendering some words redundant, see United States v. Alaska, ___ U.S. ___, ___, 117 S. Ct. 1888, 1918 (1997), Ford and the U.S. Dept. of Justice as amicus essentially argue that the phrase "services, . . . privileges, [and] advantages" covers discrimination in realms different than physical access to facilities or else these words would be superfluous. Ford

20

can also cite to the ADA itself for the proposition that an "insurance office[ ]" is a public accommodation under Title III. 42 U.S.C. S 12181(7)(F) (listing examples of public accommodations including "insurance office[]").

The fact that an insurance office is a public accommodation, however, does not mean that the insurance policies offered at that location are covered by Title III. In the instant case, Schering and MetLife offered disability benefits to Ford in the context of her employment at Schering, meaning that the disability benefits constituted part of the terms and conditions of Ford's employment. Terms and conditions of employment are covered under Title I, not Title III. "Title III is not intended to govern any terms or conditions of employment by providers of public accommodations or potential places of employment; employment practices are governed by title I of this legislation." S. Rep. No. 101-116, at 58 (1989); see H.R. Rep. No. 101-485, pt. 2, at 99 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 382. Therefore, Ford cannot state a claim against her employer, Schering, pursuant to Title III. See Parker, 121 F.3d at 1015.

Regarding MetLife, the disability benefits that Ford challenges do not qualify as a public accommodation and thus do not fall within the rubric of Title III. The plain meaning of Title III is that a public accommodation is a place, leading to the conclusion that " `[i]t is all of the services which the public accommodation offers, not all services which the lessor of the public accommodation offers[,] which fall within the scope of Title III.' " Id. at 1011 (quoting Stoutenborough v. National Football League, Inc., 59 F.3d 580, 583 (6th Cir. 1995) (a television broadcast is not covered by Title III)). This is in keeping with the host of examples of public accommodations provided by the ADA, all of which refer to places. See 42 U.S.C. S 12181(7).3 Since

_____

3. Section 12181(7) reads as follows:

The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce--

(A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five

21

Ford received her disability benefits via her employment at Schering, she had no nexus to MetLife's "insurance office" and thus was not discriminated against in connection with a public accommodation. Furthermore, the "goods, services, facilities, privileges, advantages, or accommodations" concerning which a disabled person cannot suffer discrimination are not free-standing concepts but rather all refer to the statutory term "public accommodation" and thus to what these places of public accommodation provide. Ford cannot point to these terms as providing protection from discrimination unrelated to places.

_____

rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

(B) a restaurant, bar, or other establishment serving food or drink;

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. S 12181(7).

22

Restricting "public accommodation" to places is in keeping with jurisprudence concerning Title II of the Civil Rights Act of 1964, 42 U.S.C. S 2000a (1994). Title II proscribes racial and religious discrimination in"the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . ." 42 U.S.C. S 2000a(a). This proscription has been limited to places rather than including membership in an organization, see Welsh v. Boy Scouts of Am., 993 F.2d 1267, 1269-75 (7th Cir. 1993), and rather than encompassing an organization's operations unconnected to any physical facility. See Clegg v. Cult Awareness Network, 18 F.3d 752, 755-56 (9th Cir. 1994).

Confining "public accommodation" to places is also in keeping with the Dept. of Justice's regulations to this effect:

> The purpose of the ADA's public accommodations requirements is to ensure accessibility to the goods offered by a public accommodation, not to alter the nature or mix of goods that the public accommodation has typically provided. In other words, a bookstore, for example, must make its facilities and sales operations accessible to individuals with disabilities, but is not required to stock Brailled or large print books. Similarly, a video store must make its facilities and rental operations accessible, but is not required to stock closed-captioned video tapes.

28 C.F.R. pt. 36, app. B, at 640 (1997). Just as a bookstore must be accessible to the disabled but need not treat the disabled equally in terms of books the store stocks, likewise an insurance office must be physically accessible to the disabled but need not provide insurance that treats the disabled equally with the non-disabled. While the Dept. of Justice has issued other documents stating that Title III does cover the substance of insurance contracts, see Dept. of Justice, Title III Technical Assistance Manual: Covering Public Accommodations and Commercial Facilities S III-3.11000, at 19 (Nov. 1993) ("Insurance offices are places of public accommodation and, as such, may not discriminate on the basis of disability in the sale of insurance contracts or in the terms or conditions of the insurance contracts they offer."), such an interpretation is "manifestly contrary"

23

to the plain meaning of Title III and, accordingly, is not binding on this court. Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844, 104 S. Ct. 2778, 2782 (1984); see Parker, 121 F.3d at 1012 n.5. Furthermore, since we find the plain meaning of "public accommodation" and 42 U.S.C. S 12182(a) to be clear, we have no need to analyze the ADA's legislative history.

We also note that, by aligning ourselves with the Sixth Circuit's Parker decision regarding the definition of "public accommodation[,]" we part company with the First Circuit in this regard. In Carparts Distribution Ctr., Inc. v. Automotive Wholesaler's Ass'n of New England, Inc., 37 F.3d 12 (1st Cir. 1994), the First Circuit held that Title III is not limited to physical structures. The First Circuit pointed to the inclusion of "travel service" in the list of public accommodations and noted:

> Many travel services conduct business by telephone or correspondence without requiring their customers to enter an office in order to obtain their services. Likewise, one can easily imagine the existence of other service establishments conducting business by mail and phone without providing facilities for their customers to enter in order to utilize their services. It would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. Congress could not have intended such an absurd result.

Id. at 19 (citing 42 U.S.C. S 12181(7)(F)). However, as the Sixth Circuit pointed out in Parker, 121 F.3d at 1014, the First Circuit failed to read the examples of public accommodations that piqued the First Circuit's interest in the context of the other examples of public accommodations. The litany of terms, including "auditorium," "bakery," "laundromat," "museum," "park," "nursery," "food bank," and "gymnasium[ ]" refer to places with resources utilized by physical access. 42 U.S.C. S 12181(7)(D)-(F), (H)-(L). Pursuant to the doctrine of noscitur a sociis, the terms that the First Circuit finds ambiguous should be interpreted by reference to the accompanying words of the statute "to avoid the giving of

24

unintended breadth to the Acts of Congress." Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307, 81 S. Ct. 1579, 1582 (1961). Accordingly, we do not find the term "public accommodation" or the terms in 42 U.S.C. S 12181(7) to refer to non-physical access or even to be ambiguous as to their meaning.

In sum, Ford fails to state a claim under Title III of the ADA since the provision of disability benefits by MetLife to Schering's employees does not qualify as a public accommodation.

IV.

For the above reasons, we will affirm the September 12, 1996, order of the district court dismissing Ford's complaint for failure to state a claim. Unlike the district court, we find that Ford is eligible to sue under Title I. However, Ford fails to state a claim under Titles I or III and errs in asserting that the "safe harbor" provision of Title V requires insurance companies to justify their coverage plans after a plaintiff's prima facie allegation.

25

ALITO, Circuit Judge, concurring in the judgment:

I agree with the majority that Ford fails to state a claim under the Americans with Disabilities Act (ADA). However, I reach this conclusion based solely on the insurance "safe harbor" provision located in section 501(c) of the ADA. See 42 U.S.C. S 12201(c).

Section 501(c) provides that Titles I and III of the ADA "shall not be construed to prohibit or restrict" the terms of a bona fide insurance plan. 42 U.S.C. S 12201(c). This exemption applies so long as it is not "used as a subterfuge to evade the purposes of" the ADA. Id. As the majority recognizes, the term "subterfuge" must be construed in accordance with the Supreme Court's decision in Public Employees Retirement Sys. of Ohio v. Betts, 492 U.S. 158 (1989). See Maj. Op. at 18–19. Betts concerned a "safe harbor" provision that exempted fringe benefit plans from coverage by the Age Discrimination in Employment Act (ADEA). See 29 U.S.C. S 623(f)(2) (1988).[1] Like section 501(c), the ADEA exemption provided that it would not protect a plan that was "a subterfuge to evade the purposes of" the Act. Id. In interpreting this language, the Court concluded that an employee benefit plan adopted prior to the enactment of the ADEA could not be considered a subterfuge to evade the purposes of the ADEA. Betts, 492 U.S. at 166–69 (reaffirming the holding of United Air Lines, Inc. v. McMann, 434 U.S. 192, 203 (1977)). Under the same reasoning, the insurance plan challenged by Ford cannot be considered a subterfuge to evade the purposes of the ADA since the plan was adopted prior to the enactment of the ADA.[2] See Modderno v. King, 82 F.3d 1059, 1063–1065

_____

1. Following Betts, section 623(f)(2) was amended by the Older Workers Benefit Protection Act of 1990, Pub. L. No. 101–433, S 103(1), 104 Stat. 978.

2. The disputed portions of the plan have been in effect since at least 1985. App. at 69, 87. The ADA was enacted in 1990. See 42 U.S.C. S 12101.

Three justices in McMann rejected the majority's conclusion that a plan adopted prior to the enactment of the ADEA could not be a subterfuge to avoid the purposes of that Act. See 434 U.S. at 204–05 (White, J., concurring); id. at 219 n.13 (Marshall, J., joined by Brennan,

26

(D.C. Cir. 1996) (holding that an insurance plan enacted prior to the importation of ADA standards into the Rehabilitation Act could not be considered a subterfuge to evade those standards). Accordingly, the defendants' plan is insulated from attack by section 501(c).

I further note that Ford's complaint as currently framed fails to allege that the defendants ever developed a "specific intent" to evade the purposes of the ADA. See Betts, 492 U.S. at 171. In Betts, the Court wrote:

> [W]hen an employee seeks to challenge a benefit plan provision as a subterfuge to evade the purposes of the Act, the employee bears the burden of proving that the discriminatory plan provision actually was intended to serve the purpose of discriminating in some non-fringe-benefit aspect of the employment relation.

Betts, 492 U.S. at 181. Under this reading of "subterfuge," Ford could not successfully challenge the defendants' insurance plan unless she could show that it was intended to serve the purpose of discriminating in some non-insurance-benefit aspect of her relationship with the defendants. Ford's complaint contains no such allegation of intent.

Given the effect of section 501(c) on Ford's claims, I do not think that it is necessary for the court to conclude that distinguishing between people with different disabilities for insurance purposes is not discrimination based on disability. See Maj. Op. at 12-13. In fact, it would seem that making such distinctions does constitute discrimination in the most basic sense of the word. See Webster's Third New International Dictionary at 648 (defining discrimination as

_____

J., dissenting). According to these justices, a pre-Act plan could become a subterfuge if it was maintained after the passage of the ADEA in order to evade the purposes of that Act. One could argue that this position is stronger under the ADA's "safe harbor" provision due to difference in the statutory language. Compare 29 U.S.C. S 623(f) ("is not a subterfuge to evade the purposes of" the ADEA) (emphasis added) with 42 U.S.C. S 1201(c) ("shall not be used as a subterfuge to evade the purposes of" the ADA) (emphasis added). However, I do not believe that this change is sufficient to avoid the mandate of McMann and Betts.

27

"the making or perceiving of a distinction or difference").
However, we need not wrestle with the question of what
might or might not constitute unlawful insurance
discrimination under the ADA had Congress not addressed
the issue; Congress did address the issue and provided an
explicit answer in section 501(c).

In light of the ease with which Ford's claims can be
resolved under section 501(c), I would not reach the more
difficult issues of: 1) whether a former employee who can
no longer work can meet Title I's "qualified individual with
a disability" requirement; and 2) whether Title III's public
accommodation provision guarantees anything more than
physical access. These issues have divided the circuits, and
I would reserve judgment until we are confronted with a
case in which the unique considerations of insurance plans
are not at stake.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

28