NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3991
_____

JOHN F. PEOPLES,
                            Appellant

v.

DISCOVER FINANCIAL SERVICES, INC.;
DISCOVER CARD SERVICES, INC.,
trading as Discover Card;
GINGER DAYLE;
GINGER DAYLE PRODUCTIONS;
NEW CITY STAGE COMPANY

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 08-cv-02024)
District Judge:  Honorable Edmund V. Ludwig
_____

Submitted Under Third Circuit LAR 34.1(a)
July 13, 2010

Before:  RENDELL, JORDAN and GREENAWAY, JR., *Circuit Judges*.

(Filed: July 19, 2010)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

John F. Peoples appeals an order of the United States District Court for the Eastern District of Pennsylvania granting summary judgment in favor of Discovery Financial Services, Inc., now known as DFS Services LLC ("DFS"), on his claims under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182 ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as well as on his breach of contract claim against DFS. Peoples claims that DFS violated the ADA and the Rehabilitation Act by failing to provide reasonable accommodations and safeguards to credit card holders with vision impairments. He also claims that DFS breached its contract with him by failing to carry out a credit card fraud investigation in a reasonable manner. Because there are no genuine issues of material fact and DFS is entitled to judgment as a matter of law, we will affirm.

## I.    Background

Beginning in March 2007, Peoples, who is blind, began using a Discover credit card serviced by DFS to purchase sex from a prostitute named Ginger Dayle, who conducted her business in an apartment in Philadelphia.[1] Following each session, Peoples

---

[1] The charges were processed through "Ginger Dayle Productions, Philadelphia, Pennsylvania" (App. at 67); however, Peoples acknowledged the services as prostitution in his deposition in October 2008: "I paid her and she had sex with me and there was an understanding that it was a payment for sex." (App. at 36.) Peoples did not inform DFS that these were prostitution services when he disputed the charges. The complaint studiously avoided any reference to the exact nature of the services. It describes Dayle as a "service provider, providing personal, private sessions with clients for a predetermined

2

gave his Discover credit card to Dayle, who charged the credit card and prepared a receipt for Peoples to sign. Although he could not see the amount Dayle had charged to his credit card, Peoples signed each receipt and kept a copy for himself. By November 2007, Peoples had purchased prostitution services from Dayle in this manner at least 34 times.

After reviewing his credit card billing statement for the October-November 2007 billing period with the assistance of his mother, Peoples noted eleven transactions for Dayle's services that he believed were over-billed, and, accordingly, he notified DFS of the over-billing. The transactions all occurred between October and November 2007 and included ten charges for $1,100 and one charge for $1,600. For each disputed transaction, Peoples claims that Dayle had told him that the receipt indicated that he was being charged "$375 or $750," when he was actually charged $1,100 in ten instances and $1,600 once. (Appellant's Op. Br. at 3.)[2] While Peoples disputes those charges from October to November, which allegedly exceeded his expected payments, he does not contest similar charges from March to September, even though he paid for Dayle's services in amounts in

_____

per-session fee. She is not a doctor, nurse or licensed medical practitioner. She advertises herself at [sic] an expert at providing personal, hands-on service to individual customers in private sessions at a set rate." (App. at 17.) Peoples also failed to admit in his response to admissions and interrogatories that he was purchasing prostitution services. It was not until his deposition that he acknowledged he was buying sex.

[2]For simplicity, references herein to the Appellant's Amended Opening Brief are noted as "Appellant's Op. Br.".

excess of $750, including $1,075 twice and $1,100 twice.[3]  Peoples says that he is seeking

to recover only the amount in excess of what he agreed to pay Dayle for sexual services.[4]

DFS investigated Peoples's claims and determined that there was not a sufficient

basis to say there had been fraud in the billing.[5]  It therefore refused to credit his account

for the amounts in dispute.  Further, DFS noted that there were ways in which Peoples

could have quickly found out the amounts that Dayle was billing his credit card.  For

example, DFS provides a 24-hour telephone service that any card holder can call to hear a

list of recent transactions posted to the account by date, amount, and transaction type.  In

addition, that same telephone service provides callers with the option of connecting

directly to a live customer service representative for information about recent transactions

and the account in general.  A member using that service also has access to pending credit

authorizations that are posted as soon as a merchant submits the charge.

---

[3]In that same period, Peoples also made payments of $375 once and $750 eighteen times.

[4]Of course, given that he is vague about what the agreed-upon amounts were, his concession is not entirely helpful.  The record does not reveal how one would know whether the events of any individual session with Ms. Dayle were worth $375 or $750. Peoples is definite about one thing though: "[he] is not claiming in this lawsuit that merchant Dayle breached a contract by failing to perform sexual services up to snuff ... . [And he] is not claiming that Dayle's sexual technique did not justify her price." (Appellant's Op. Br. at 9-10.)

[5]As more fully discussed herein, DFS contacted Dayle to verify the disputed charges and she produced signed sales receipts which, along with a written contract she had with Peoples for yoga and pilates services, and the history of the account, evidently prompted DFS to conclude that Peoples's complaints reflected a customer service dispute between him and Dayle, rather than fraud.

On April 18, 2008, Peoples filed the present action against DFS, alleging violations of the ADA, the Rehabilitation Act, and breach of contract.[6] The parties filed cross-motions for summary judgment, and, on September 22, 2009, the District Court granted summary judgment in favor of DFS and against Peoples on all claims. This timely appeal followed.

II.    **Discussion**[7]

We exercise plenary review over an appeal from a grant of summary judgment, which means that we apply the same standard applicable in the District Court. *Lauren v. DeFlaminis*, 480 F.3d 259, 265-66 (3d Cir. 2007). Thus, we will affirm a grant of summary judgment if our review reveals that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Id.* at 266. In determining whether summary judgment is warranted, we review the facts in the light most favorable to the non-moving party, and draw all reasonable factual inferences in that party's favor. *Id.*

---

[6]Peoples also brought a claim under the Pennsylvania Human Relations Act, 43 PA. STAT. ANN. § 951 ("PHRA"). The District Court granted summary judgment against him on that claim, but he has waived any appeal in that regard by failing to discuss the PHRA claim in his opening brief. *See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue ... will not suffice to bring that issue before this court.") (citation omitted).

[7]The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. We have appellate jurisdiction under 28 U.S.C. § 1291.

*A.    The ADA Claim*

Title III of the ADA states that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, leases to, or operates a place of public accommodation."  42 U.S.C. § 12182(a).  Peoples claims that DFS discriminated against him by failing to consider his blindness when addressing his fraud claim.

The Courts of Appeals are split on whether the term "public accommodation," as used in the ADA, refers to an actual physical structure or whether it has some broader meaning.  *Compare Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1115 (9th Cir. 2000) (holding that an insurance company administering an employer-provided disability plan is not a place of public accommodation), *and Ford v. Schering-Plough Corp.*, 145 F.3d 601, 612 (3d Cir. 1998) ("The plain meaning of Title III is that a public accommodation is a place ... ."), *and Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997) (holding that "a public accommodation is a physical place") *with Morgan v. Joint Admin. Bd., Ret. Plan of the Pillsbury Co.*, 268 F.3d 456, 459 (7th Cir. 2001) (refusing to interpret "public accommodation" literally, so as to "denot[e] a physical site"), *and Carparts Distribution Ctr., Inc. v. Auto. Wholesalers Ass'n of New England, Inc.*, 37 F.3d 12, 19 (1st Cir. 1994) (holding that public accommodations are not limited to physical structures).  Our court is among those that have taken the position that the term is limited to

6

physical accommodations. *Ford*, 145 F.3d at 612. Despite Peoples's request that we "clarify or reconsider" our holding in *Ford* and extend our interpretation of public accommodations to include things other than physical places (Appellant's Op. Br. at 27), we are bound by our precedent. *See Pa. Ass'n of Edwards Heirs v. Rightenour*, 235 F.3d 839, 844 (3d Cir. 2000) ("Under this Court's Internal Operating Procedures, we are bound by, and lack the authority to overrule, a published decision by a prior panel ... .") (citation omitted).

Under *Ford*, Peoples's argument fails because the communication between Dayle's credit card processing terminal and DFS is not a "public accommodation" within the meaning of the ADA. *See* 145 F.3d at 612 (holding that "[t]he plain meaning of Title III is that a public accommodation is a place ..."). As the District Court noted, "[t]he evidence is that [Peoples] used his Discover Card to pay for the transactions with Dayle at her apartment," and, "[t]hough [DFS's] credit services can be used by cardmembers at a merchant's place of accommodation, DFS itself does not own, lease or operate those locations." (App. at 6.) Thus, because DFS's alleged discrimination (i.e., the supposedly insufficient investigation of Peoples's fraud claim) in no way relates to the equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations on physical

7

property that DFS, rather than Dayle, owns, leases, or operates, the District Court correctly granted summary judgment against Peoples on his ADA claim.[8]

### B.     The Rehabilitation Act Claim

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service."  29 U.S.C. § 794(a); *see also Disabled in Action v. Sykes*, 833 F.2d 1113, 1116 n.5 (3d Cir. 1987) ("Section 504 provides a private right of action to handicapped persons who are excluded from federally funded programs").  The District Court correctly granted summary judgment in favor of DFS on Peoples's claim under Section 504 of the Rehabilitation Act because Peoples failed to present any evidence showing that DFS is related to an executive agency or the United States Postal Service, or that it receives federal funds.  Peoples claims for the first time on appeal that because "Discover Card"[9] received funds in 2009 from the government's financial sector bailout package, the company falls

---

[8]As a practical point, we note again that DFS did provide a telephone number available 24-hours a day, seven days a week, allowing those with vision impairments to check on charges to their accounts.  *See supra* page 4.

[9]Peoples uses the term "Discover Card" in his brief, presumably referring to DFS. (Appellant's Op. Br. at 28.)  However, as noted by DFS, "Discover Card" is not an "entity but rather a credit card serviced by DFS[.]"  (App. at 24.)

within the purview of Section 504. However, it is well established that "absent exceptional circumstances, issues not raised before the district court are waived on appeal." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 253 (3d Cir. 2007). There are no exceptional circumstances here. Peoples could have – but did not – present that argument to the District Court, although the information he relied on is dated eight months prior to the District Court's decision. We therefore decline to consider his argument in that regard and will affirm the District Court's grant of summary judgment against him on his Rehabilitation Act claim.

### C.    The Breach of Contract Claim

To establish a breach of contract claim in Pennsylvania, a plaintiff "must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). When Peoples obtained a Discover credit card, he and DFS entered into a contract known as the "cardmember agreement." In claiming that DFS did not conduct a reasonable investigation of the disputed transactions, Peoples does not point to any specific section of that agreement that DFS breached.[10] Presumably, he is relying on the provision

---

[10]Peoples says, "[w]hether it is explicitly stated in written cardmember agreement [sic] or not, there is no question that [DFS] regularly conducted fraud investigations for customers and that that was a normal part of the customer-credit card company contractual relationship." (Appellant's Op. Br. at 9.)

pursuant to which DFS agreed that "[i]f a merchant fails to provide [a customer's] purchase to [his] satisfaction and [he] request[s] a credit to [his] Account, [DFS] will investigate the dispute." (App. at 76 (cardmember agreement at 10, under heading "Claims and Disputes").) In particular, he claims that DFS's investigation was unreasonable because it "appl[ied] its 'signed receipt' rule in an overly strict way that did not take account of obvious facts," including his blindness.[11] (Appellant's Op. Br. at 9.)

As an initial matter, it is questionable whether Peoples has any claim for breach of contract, given that he himself breached the cardmember agreement when he used his account to pay for prostitution in Pennsylvania. Pursuant to the cardmember agreement, he agreed not to use his account to pay "for any transactions that are unlawful where [he] reside[d] or where [he was] physically located when [he] use[d] the Account to initiate the transaction ('Prohibited Transactions')." (App. at 72.) In Pennsylvania, patronizing a prostitute is illegal. 18 PA. CONS. STAT. § 5902(e). Thus, even if DFS had breached its contract with Peoples by failing to reasonably investigate the disputed transactions, Peoples is arguably in no position to enforce the contract against DFS because he breached the contract prior to disputing the charges. Cf. LJL Transp., Inc. v. Pilot Air Freight Corp., 962 A.2d 639, 648 (Pa. 2009) ("It is ... well established that '[a] party also may not insist upon performance of the contract when he himself is guilty of a material breach of the contract.'"

---

[11]It is likely that the "signed receipt" rule that Peoples refers to is DFS's policy of contacting the merchant in question and requesting that the merchant provide receipts documenting the charges in dispute.

(second alteration in original) (quoting *Ott v. Buehler Lumber*, 541 A.2d 1143, 1145 (Pa. 1988))).

Setting that aside, there is no indication that DFS did not properly conduct its investigation. When Peoples reported the dispute to DFS, the case initially went to a customer service section within the company that investigates disputes arising from alleged over-billing. As part of its investigation, a customer service representative contacted Dayle about the disputed transactions and received signed sales receipts and a contract showing that Peoples had engaged her to provide yoga or pilates services. The receipts showed that Peoples's account had been charged ten times for $1,100 and once for $1,600. Those amounts resembled other charges Peoples had previously paid for Dayle's services, which he was not contesting. Indeed, the record reflects that from March to September, Peoples paid $375 once, $750 eighteen times, $1,075 twice, and $1,100 twice. DFS thus concluded that the transactions Peoples complained about – and which he acknowledged had taken place – were sufficiently documented and consistent with prior usage of the account that there was an inadequate basis to declare that the amounts charged were fraudulent. Because Peoples continued to dispute the transactions, the investigation was re-opened by DFS's fraud investigation department. However, since DFS's definition of fraud is a charge that the customer did not authorize, or from which the customer received no benefit, the fraud unit likewise determined that no fraud occurred because Peoples clearly authorized Dayle to

11

place a charge on his card and he acknowledged receiving some benefit. As a result, DFS refused to credit Peoples's account for the alleged overcharges.[12]

Peoples has provided no evidence, beyond his say-so, that the sums he was charged were not agreed to. But, even assuming the facts were as he contends, that is beside the point. What is at issue is DFS's obligation to investigate a dispute between a "merchant" and a customer. Even with all inferences drawn in his favor, Peoples has not shown that DFS failed to reasonably inquire into the dispute.

In sum, Peoples has adduced no evidence to show that DFS failed to investigate his claim in a reasonable manner and in accordance with the company's established policies and procedures. We therefore agree with the District Court that there is no evidence that DFS breached a contractual duty to Peoples.

## III. Conclusion

For the foregoing reasons, we will affirm the judgment of the District Court.

---

[12]Peoples evidently decided that he can seek redress from Dayle directly. He has filed a suit against her in the Civil Trial Division of the Court of Common Pleas of Philadelphia County, Pennsylvania, captioned *Peoples v. Dayle*, Docket No. 09-10-03340.