Filed 6/19/20

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ABELARDO MARTINEZ,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>SAN DIEGO COUNTY CREDIT UNION,<br><br>    Defendant and Respondent. | D075360<br>(Consolidated with D076055)<br><br><br>(Super. Ct. No. 37-2017-00024673-CU-CR-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald F. Frazier, Judge.  Reversed.

Pacific Trial Attorneys, Scott J. Ferrell and Richard Hikida for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Gregory F. Hurley and Bradley J. Leimkuhler for Defendant and Respondent.

Abelardo Martinez, who is blind, brought an action against San Diego County Credit Union (Credit Union) claiming its website is incompatible with software permitting him to read website content.  He alleged this defect denied him equal access to, and full enjoyment of, the Credit Union's website and its physical locations.  Martinez asserted a single cause of action under the Unruh Civil Rights Act based on two alternate

theories: (1) Credit Union's website violates the American Disabilities Act (ADA); and (2) Credit Union's actions constitute intentional discrimination prohibited by the Unruh Civil Rights Act. (See Civ. Code, § 51 et seq.; 42 U.S.C., § 12101 et seq.)[1]

On the day scheduled for jury selection, the court dismissed the action on its own motion based on its understanding Martinez was intending to pursue only the ADA theory, and the court's finding Martinez had not sufficiently alleged Credit Union's website constitutes a "public accommodation" within the meaning of the ADA. (§ 12182(a).) Although the court characterized its ruling as a nonsuit, the parties agree it was a conclusion based solely on Martinez's pleadings.

Martinez appeals. We determine the court erred in dismissing the action at the pleadings stage based on the ADA's public-accommodation element. Although the courts have not yet articulated a single clear standard on this issue, most of the federal circuits and one California Court of Appeal have held a disabled plaintiff can state a viable ADA claim for alleged unequal access to a private entity's website if there is a sufficient nexus between the claimed barriers and the plaintiff's ability to use or enjoy the goods and services offered at the defendant's physical facilities. Under this standard, we conclude Martinez has alleged a sufficient nexus to state an ADA violation. We thus do not reach the broader issue whether a website constitutes a public accommodation governed by the ADA even without a nexus to the defendant's physical location.

---

[1] Unspecified statutory references are to Title 42 of the United States Code.

2

We reject Credit Union's alternate argument that the dismissal was proper because the United States Congress has not enacted specific website accessibility standards. Even without these standards, the courts have the authority to interpret applicable ADA provisions and apply them to website accessibility issues. We also find unavailing Credit Union's challenges to potential remedies for alleged defects on its website. These challenges are based on facts outside the appellate record and are premature at the pleading stage.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### *Complaint*

Martinez is permanently blind and requires screen reading software to vocalize visual information on the computer screen, allowing him to "read" website content and access the Internet.

In July 2017, Martinez filed a complaint against Credit Union. According to his allegations, Credit Union maintains its website in such a way that it contains "numerous access barriers" precluding him from using his screen reading software to access the information on the website. Specifically, Martinez alleged Credit Union's website is incompatible with this software because the website contains: (1) missing alternative text, which is code embedded beneath a graphical image that allows screen readers to vocalize a description of the graphics and permits users to determine the website content;

---

[2]    Credit Union devotes significant portions of its appellate brief to negatively characterize ADA lawsuits in general. These assertions are unhelpful and unsupported by the record, and we disregard them.

(2) empty links, creating confusion for keyboard and screen reader users; (3) redundant links resulting in additional navigation and unnecessary repetition; and (4) missing form labels, which creates a problem because the function or purpose of the form control may not be presented to screen reader users.

Martinez alleged the screen reading software is "the only method by which a blind person may independently access the internet," and described the online industry standards organization's publication of the Web Content Accessibility Guidelines version 2.0 (Accessibility Guidelines), which sets forth rules to ensure website accessibility for visually impaired individuals. These rules include adding "invisible alternative text to graphics" to ensure "all functions can be performed using a keyboard" and "that image maps are accessible." He alleged that without these basic components, "a website will be inaccessible to a blind or visually impaired person using a screen reader."

With respect to Credit Union, Martinez alleged it operates multiple credit union locations, and that its website is "integrated" with the physical locations. He claimed Credit Union's website provides "access to the array of [Credit Union's] services, including a location locator, descriptions of its products and services, and many other benefits related to these facilities and services." He alleged that he has made multiple attempts to use and navigate the website, but because of the website's formatting, he has been unable to do so. He claimed this inability to use the website has deterred him from visiting Credit Union's physical locations, using the website, and obtaining the benefits of Credit Union's goods and services. Specifically, he alleged he is unable to "effectively browse for [Credit Union's] locations, products and services online," and claimed that if

4

the website were accessible, he "could independently investigate services and products, and find the locations to visit via Defendant's website as sighted individuals can and do."

Martinez asserted a single cause of action for violation of the Unruh Civil Rights Act. (Civ. Code, § 51.) He alleged two theories for recovery. First, he alleged Credit Union's conduct in maintaining its website in a form inaccessible to visually impaired individuals, and failing to take corrective action after notice, constituted prohibited "intentional discrimination" under the Unruh Civil Rights Act. Second, he claimed Credit Union's website violates the ADA, an independent basis for liability under the Unruh Civil Rights Act.

Martinez sought: (1) $4,000 per violation; (2) injunctive relief requiring Credit Union to take steps necessary to make its website accessible to visually impaired individuals (but limiting his request to the expenditure of no more than $50,000 to correct the deficiencies); and (3) attorney fees and costs not to exceed $74,999.

Credit Union answered, denying the allegations, but did not challenge the pleadings or move for summary judgment. Trial was scheduled for Tuesday, November 13, 2018.

*November 8, 2018 Hearing*

Several days before the trial date, on Thursday, November 8, the court held a hearing on the parties' motions in limine, proposed jury instructions, and verdict forms. The court and counsel first discussed each of Martinez's eight motions and Credit Union's three motions. Of relevance here, during the discussion, Credit Union asked the court to exclude any reference to the Accessibility Guidelines, and after lengthy arguments, the

5

court said it would reserve ruling on the issue, but commented it was "up to the jury to decide" if the Credit Union's website violated statutory standards, and therefore it may permit Martinez to present evidence of the Accessibility Guidelines "for limited purposes [and] with a limiting instruction." On Credit Union's motion to exclude any evidence of barriers that were not specifically alleged, the court also reserved ruling on the motion, but noted that Credit Union had not brought a demurrer, and to the extent the complaint was not sufficiently detailed to provide adequate notice, Credit Union had the full opportunity to conduct discovery.

After reiterating November 13 as the trial start date and informing counsel of its department trial rules, the court and counsel discussed the proposed jury instructions and verdict forms. Toward the end of this discussion, counsel told the court there is a split among the federal circuits as to whether a website is subject to the ADA, and whether a nexus between the defendant's website and its physical facilities is required to trigger ADA protection. The court responded that the arguments on the issue of "accessing the physical" space and any required "nexus" had "piqued [its] interest," and that it was "interested in briefing on that." After counsel told the court that most of the case law has arisen in the federal courts, and no California appellate court has yet ruled on this issue, the court said, "Lucky me. So you . . . need to brief this. You both need to put together a trial brief for me. I've got a pretty good feel, but you [both] know this area inside and out . . . since there aren't any California appellate court cases. . . ." The court asked counsel to email their briefs by Monday morning (the day before jury selection was

6

scheduled to begin), and said, "I'll go through the briefs Tuesday, and then we'll start picking the jury Tuesday afternoon."

On Monday November 12, the parties emailed their trial briefs to the court. Credit Union's brief was 44 pages and addressed numerous legal issues in addition to the public accommodations issue raised by the court. Martinez's brief was 19 pages and more limited than Credit Union's brief.

*November 13 Hearing and Order*

The next day, the parties met in chambers for an unrecorded discussion. After the discussion, the court held a hearing on the record. At the outset of the hearing, the court said:

> "We have had [a] chambers discussion. I have reviewed both sides' trial briefs, and I have given . . . this matter a tremendous amount of thought over the three-day weekend. And with the benefit of the trial briefs, I think the Court's position has clarified.

> "And I asked counsel back in chambers . . . if they would be opposed to not going through the procedure of picking a jury and doing opening statements given the fact that *I have decided to grant the defendant's motion for nonsuit as I read their brief in terms of the website not being subject to the ADA.*" (Italics added.)

When the court asked Martinez's counsel whether he agreed with its comments about the procedure, counsel responded:

> "[*I*]*t is my understanding that the Court is sua sponte granting a nonsuit on the basis that the Court has determined, as a matter of law, that neither the Unruh Act nor the Americans with Disabilities Act applies to a website as alleged here, which is a website that is in a nexus to a physical building.* [¶] With that being the case, I agree that it would be futile to proceed in that the Court has determined that as a matter of law. We would simply ask that for purposes of

7

creating a complete record for appeal, that the court receive and accept the trial briefs that were filed herein."  (Italics added.)

After defense counsel agreed with this description, the court said it would prepare a brief order that would be "pretty much very similar to the defense brief on this point."

Several days later, the court issued an order entitled "Sua Sponte Order Granting Motion for Nonsuit."  (Some capitalization omitted.)  The order stated Credit Union's motion was essentially a challenge to the pleadings, and the court "agreed with the Defense position . . . [that] the complaint failed to state facts sufficient to constitute a cause of action."  The court then identified the two alternative legal grounds for proving an Unruh Civil Rights Act violation based on disability discrimination (violation of the ADA and intentional discrimination), but addressed only the first ground because it said "Plaintiff has indicated that he intends to proceed solely by proving that Defendant violated the ADA."

The court then stated its conclusion that Credit Union's website was not subject to the ADA because the ADA applies only to "a place of public accommodation," and a website does not constitute a "public accommodation."  The court said it was following the Third, Sixth, Ninth, and Eleventh Circuits holding that the phrase "public accommodation" means a physical structure, but did not mention the "nexus" theory adopted by these circuits.  The court also quoted an unpublished federal district court decision from the Eastern District of Virginia, dismissing a visually impaired plaintiff's action against a credit union for website deficiencies based on the court's conclusion the ADA did not apply to the website.  (*Carroll v. Northwest Fed. Credit Union* (E.D.Va.,

8

Jan. 26, 2018, No. 1:17-CV-01205) 2018 WL 2933407, at p. *2 (*Northwest*).) The court did not mention (because neither party cited) other federal court decisions reaching contrary conclusions and upholding a visually impaired plaintiff's action against a credit union for a defective website on a nexus theory. (See Discussion section, part II.B.)

## DISCUSSION

### I. *Review Standard*

Although the court labeled its "sua sponte" dismissal ruling a "nonsuit," both parties agree that in substance the court's order reflected a determination on the sufficiency of Martinez's pleading. We agree with this characterization. The court made clear it was ruling on the ADA "public accommodations" issue based solely on the complaint's allegations, and was not considering any proposed evidence or factual assertions made during the in limine motions hearing or chambers discussion, or in the parties' trial briefs.

When a court rules on a challenge to a pleading after a complaint and answer have been filed, the motion is in the nature of a judgment on the pleadings and can be made before or during trial. (See *Stoops v. Abbassi* (2002) 100 Cal.App.4th 644, 650.) A court may grant a judgment on the pleadings on its own motion. (Code Civ. Proc., § 438, subds. (b)(2), (c)(3)(B)(ii).) A motion for judgment on the pleadings " 'performs the same function as a general demurrer, and [thus] attacks only defects disclosed on the face of the pleadings or by matters that can be judicially noticed. [Citations.]' " (*Burnett v. Chimney Sweep* (2004) 123 Cal.App.4th 1057, 1064; see *People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777 (*Harris*).) The court must

9

determine whether the complaint states a cause of action assuming all of the alleged facts are true.  (*Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (1996) 44 Cal.App.4th 194, 198.)

We review the court's ruling de novo.  (*Harris*, *supra*, 59 Cal.4th at p. 777; *Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1490 (*Rossberg*).)  We do not review the validity of the trial court's reasoning, and must affirm the court's ruling if it was correct on any legal theory raised by the parties.  (*Orange Unified School Dist. v. Rancho Santiago Community College Dist.* (1997) 54 Cal.App.4th 750, 757.)

## II.  *Unruh Civil Rights Act*

California's Unruh Civil Rights Act provides:  "All persons within the jurisdiction of this state are free and equal, and no matter what their . . . disability . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."  (Civ. Code, § 51, subd. (b).)  A plaintiff can recover under the Unruh Civil Rights Act on two alternate theories:  (1) a violation of the ADA (§ 51, subd. (f)); or (2) denial of access to a business establishment based on intentional discrimination.  (See *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 670.)

We begin with the ADA violation claim.  Because we conclude the court erred in dismissing the complaint on this theory, we do not reach the issue whether the alleged intentional discrimination theory also supports the cause of action and/or whether the court correctly found that Martinez had abandoned this theory for purposes of the "nonsuit" motion.  We are required to reverse if the plaintiff has stated a viable cause of

10

action on any legal theory, and we do so based on the ADA theory.  On remand, Martinez may also pursue the alternate intentional discrimination claim if it is supported by the facts and applicable legal principles and the trial court finds there has been no forfeiture.

A.  *Generally Applicable Legal Principles*

Title III of the ADA prohibits discrimination against disabled individuals by private entities, such as Credit Union.  Title III provides:  "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations *of any place of public accommodation* by any person who owns, leases (or leases to), or operates a place of public accommodation."  (§ 12182(a), italics added.)

The purpose of this title is " 'to bring individuals with disabilities into the economic and social mainstream of American life . . . in a clear, balanced, and reasonable manner.'  Congress intended that people with disabilities have equal access to the array of goods and services offered by private establishments and made available to those who do not have disabilities. . . ."  (*Gniewkowski v. Lettuce Entertain You Enters.* (W.D.Pa. 2017) 251 F.Supp.3d 908, 916; accord *PGA Tour, Inc. v. Martin* (2001) 532 U.S. 661, 674-675 (*PGA Tour*).)

To establish a violation, a plaintiff must show:  (1) a covered disability; (2) "the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied *public accommodations* by the defendant because of [the] disability."  (*Molski v. M.J. Cable, Inc.* (9th Cir. 2007) 481 F.3d 724, 730, italics added; accord, *Brown v. Whole Foods Mkt. Grp., Inc.* (D.C. Cir.

11

2015) 789 F.3d 146, 151; *Ariz. ex rel. Goddard v. Harkins Amusement Enters*. (9th Cir. 2010) 603 F.3d 666, 670; see § 12182(a), (b).)

It is undisputed that Martinez alleged a covered disability, and the Credit Union's physical buildings are "places of public accommodations" within the meaning of the ADA.  (§ 12182(a).)  But Martinez alleges he was discriminated against based on barriers on Credit Union's website, not at one of its buildings.  Thus, the issue before us is whether the website qualifies as a place of public accommodation.

The ADA defines the phrase "place of public accommodation" by enumerating 12 categories of covered "places" and "establishments," giving non-exclusive examples of types of enterprises falling into each category.[3]  (§ 12181(7)(A)-(L); *Suvino v. Time Warner Cable Inc.* (S.D.N.Y., Aug. 31, 2017, No. 16 CV 7046-LTS-BCM) 2017 WL 3834777, at p. *1; see *PGA Tour*, *supra*, 532 U.S. at pp. 676-677; *National Ass'n of the*

---

[3]    These categories are:  "(A) an inn, hotel, motel, or other place of lodging . . . . [¶ . . . ¶]  (B) a restaurant, bar, or other establishment serving food or drink; [¶ . . . ¶] (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment; [¶ . . . ¶]  (D) an auditorium, convention center, lecture hall, or other place of public gathering; [¶ . . . ¶]  (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment; [¶ . . . ¶]  (F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment; [¶ . . . ¶]  (G) a terminal, depot, or other station used for specified public transportation; [¶ . . . ¶]  (H) a museum, library, gallery, or other place of public display or collection; [¶ . . . ¶]  (I) a park, zoo, amusement park, or other place of recreation; [¶ . . . ¶]  (J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education; [¶ . . . ¶]  (K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and [¶ . . . ¶]  (L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation."  (§ 12181(7)(A)-(L).)

*Deaf v. Netflix, Inc.* (D.Mass. 2012) 869 F.Supp.2d 196, 201 (*Netflix*).)  The listed examples mainly reference physical locations.  The implementing regulations similarly define a public accommodation by referring to a "facility," which is in turn defined as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock . . . or other real or personal property, including the site where the building, property, structure, or equipment is located."  (28 C.F.R. § 36.104.)

A website is not identified in any of the statutory categories.  This is not surprising as there were no commercial websites when the ADA was enacted in 1990.  But in the 30 years since, websites have become central to American life.  They are widely used by both consumers and businesses to communicate information and conduct transactions, and are now essential tools in conducting daily affairs.[4]  Thus, the issue whether websites are subject to ADA requirements has been the subject of a growing number of lawsuits, judicial attention, and academic commentary.  (See Daniel Sorger, *Writing the Access Code: Enforcing Commercial Web Accessibility Without Regulations Under Title III of the Americans with Disabilities Act* (2018) 59 B.C. L.Rev. 1121; see also Alissa Carter Verson, *A New Era of Accessibility: Website Compliance with the Americans with Disabilities Act* (2019) 32 DCBA Brief 14; Abrar & Dingle, *From Madness to Method: The Americans with Disabilities Act Meets the Internet* (2009) 44 Harv. C.R.-C.L. L.Rev. 133.)

---

4      During the current pandemic, the Internet and websites have become even more critical, but we consider the issues before us based on circumstances at the time they arose, in 2017.

13

The regulatory agency charged with implementing the ADA (the Department of Justice (DOJ)) has previously endorsed the applicability of Title III to " 'Web sites of public accommodations,' " but has not provided specific regulatory guidance. (*Robles v. Domino's Pizza, LLC* (9th Cir. 2019) 913 F.3d 898, 903, 906-907, 910 (*Robles*); *Reed v. 1-800-Flowers.com, Inc.* (E.D.N.Y. 2018) 327 F.Supp.3d 539, 549-550; *Gorecki v. Hobby Lobby Stores, Inc.* (C.D.Cal., June 15, 2017, No. CV 17-1131-JFW(SKX)) 2017 WL 2957736, at pp.*4-*5.)[5]

And the courts have reached different conclusions on the issue whether a website is a public accommodation. The federal courts have expressed two main views. The different views stem primarily from the extent to which the court adheres to the express statutory language *or* whether it finds legislative history and intent to be paramount considerations.

One view (the minority view) is that websites are "public accommodations" within the meaning of the ADA. This approach has been adopted by courts in the First, Second, and Seventh Circuits. (*National Ass'n of the Deaf v. Harvard University* (D.Mass. 2019)

---

[5]    In 2010, the DOJ issued an "Advance Notice of Proposed Rulemaking" on web accessibility to clarify private entities' " 'obligations to make websites accessible' " (*Robles*, *supra*, 913 F.3d at p. 903), and the DOJ has also filed statements of interest and amicus briefs in Title III cases supporting ADA website applicability (*Gorecki*, *supra*, 2017 WL 2957736, at p. *4; see *Gil v. Winn Dixie Stores, Inc.* (S.D.Fla. 2017) 242 F.Supp.3d 1315, 1316-1317 (*Gil*)). But the DOJ has not issued specific regulations, and in 2017, withdrew its proposed website rule. (*Robles*, at p. 910.) In explaining the withdrawal, the DOJ stated it " 'continue[s] to assess whether specific technical standards are necessary and appropriate to assist covered entities with complying with the ADA.' " (*Id.* at p. 909.)

14

377 F.Supp.3d 49, 57-59 (*Harvard*); *Gil*, *supra*, 242 F.Supp.3d at pp. 1318-1319; see *Carparts Distrib. Ctr. v. Automotive Wholesaler's Ass'n* (1st Cir. 1994) 37 F.3d 12, 19-20 (*Carparts*); *Netflix*, *supra*, 869 F.Supp.2d at pp. 201-203*; Doe v. Mutual of Omaha Ins. Co.* (7th Cir. 1999) 179 F.3d 557, 559; *Access Living of Metropolitan Chicago v. Uber Technologies*, *Inc.* (N.D.Ill. 2018) 351 F.Supp.3d 1141, 1155-1156; *Pallozzi v. Allstate Life Ins. Co.* (2nd Cir. 1999) 198 F.3d 28, 32; *Andrews v. Blick Art Materials*, *LLC* (E.D.N.Y. 2017) 268 F.Supp.3d 381, 390-393 (*Andrews*); *National Federation of the Blind v. Scribd Inc.* (D.Vt. 2015) 97 F.Supp.3d 565, 567-576 (*Scribd*).)

Courts adopting this view have relied on the "service establishment[s]" category of the statutory definition, and particularly the fact that "travel service" is contained in the illustrative list of these establishments (§ 12181(7)(F); see fn. 3, *ante*), suggesting that Congress must have contemplated a public accommodation would "include providers of services which do not require a person to physically enter an actual physical structure." (*Carparts*, *supra*, 37 F.3d at p. 19; see *Scribd*, *supra*, 97 F.Supp.3d at p. 572.) The *Carparts* court observed, "[i]t would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. Congress could not have intended such an absurd result." (*Carparts*, at p. 19*; see Andrews*, *supra*, 268 F.Supp.3d at p. 396; *Scribd*, at pp. 572-573.)

These courts have also emphasized the critical nature of websites for transacting business in one's daily life, and that Congress made clear its intention that the ADA adapt to changes in technology. (See *Andrews*, *supra*, 268 F.Supp.3d at p. 395 [ADA's " 'broad

mandate' " and its " 'comprehensive character' are resilient enough to keep pace with the fact that the virtual reality of the Internet is almost as important now as physical reality alone was when the statute was signed into law."]; *Scribd*, *supra*, 97 F.Supp.3d at p. 575 ["excluding disabled persons from access to covered entities that use [websites] as their principal means of reaching the public would defeat the purpose of this important civil rights legislation"]; *Netflix*, *supra*, 869 F.Supp.2d at p. 200 ["In a society in which business is increasingly conducted online, excluding businesses that sell services through the Internet from the ADA would run afoul of the purposes of the ADA" in that it would prevent "individuals with disabilities" from "fully enjoy[ing] the goods, services, privileges and advantages available indiscriminately to other members of the general public."]; *Del-Orden v. Bonobos, Inc.* (S.D.N.Y., Dec. 20, 2017, No. 17 CIV. 2744 (PAE)) 2017 WL 6547902, at p. *9 ["Congress's purposes in adopting the ADA would be frustrated were the term 'public accommodation' given a narrow application, under which access to the vast world of Internet commerce would fall outside the statute's protection."]; see also H.R.Rep. No. 101-485(II), at p. 108 (1990), reprinted in 1990 U.S.C.C.A.N. at pp. 303, 391 ["The Committee intends that the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times."].)

The second view (the majority view) is that websites are not "public accommodations" under the ADA, *but* a denial of equal access to a website can support an ADA claim if the denial has prevented or impeded a disabled plaintiff from equal access to, or enjoyment of, the goods and services offered at the defendant's physical

16

facilities. This view has been adopted by courts in the Third, Sixth, Ninth, and Eleventh Circuits. (*Gil*, *supra*, 242 F.Supp.3d at p. 1319; see *Robles*, *supra*, 913 F.3d at pp. 905-906;[6] *Menkowitz v. Pottstown Mem'l Med. Ctr.* (3rd Cir. 1998) 154 F.3d 113, 122 (*Menkowitz*); *Mahoney v. Bittrex, Inc.* (E.D.Pa., Jan. 14, 2020, No. CV 19-3836) 2020 WL 212010, at p. *2 (*Mahoney*); *Parker v. Metropolitan Life Ins. Co.* (6th Cir. 1997) 121 F.3d 1006, 1010-1014 (*Parker*); *Castillo v. Jo-Ann Stores, LLC* (N.D.Ohio 2018) 286 F.Supp.3d 870, 876-881 (*Castillo*); *Haynes v. Dunkin' Donuts, LLC* (11th Cir. 2018) 741 Fed. Appx. 752, 754 (*Haynes*); *Gomez v. General Nutrition Corp.* (S.D.Fla. 2018) 323 F.Supp.3d 1368, 1375 (*General Nutrition*); see also *Rendon v. Valleycrest Prods., Ltd.* (11th Cir. 2002) 294 F.3d 1279, 1284-1286.)

The courts adopting this narrower statutory definition of a "public accommodation" have relied on Congress's explicit listing of the type of places considered to be "public accommodations," and have emphasized that essentially all of these categories describe a physical location. (§ 12181(7)(A)-(L); see *Parker*, *supra*, 121 F.3d at pp. 1010-1014; *Weyer*, *supra*, 198 F.3d at p. 1114.) With respect to section 12181(7)(F)'s identification of "service establishment[s]" such as a "travel service," these courts have noted that under the statutory construction canon "*noscitur a sociis*," a statutory term must be construed in the context of the accompanying words, thus

---

6    In recently applying this standard, the Ninth Circuit adhered to its earlier decision finding a public accommodation is a physical building (absent a "nexus") (see *Weyer v. Twentieth Century Fox Film Corp.* (9th Cir. 2000) 198 F.3d 1104, 1115 *(Weyer)*), but left open the issue whether it would be receptive to adopting a broader view. (*Robles*, *supra*, 913 F.3d at pp. 905-906 & fn. 6.)

17

supporting that a "travel service" also identifies a physical place.  (*Parker*, at p. 1014; see *Weyer*, 198 F.3d at p. 1114; *Ford v. Schering-Plough Corp.* (3rd Cir. 1998) 145 F.3d 601, 613-614 (*Ford*); see also *Magee v. Coca-Cola Refreshments USA, Inc.* (5th Cir. 2016) 833 F.3d 530, 534-535; *Harvard*, *supra*, 377 F.Supp.3d at pp. 59-60.)

But these courts also recognize that a website can be important to providing access to a defendant's public accommodation (physical premises) and to a disabled person's ability to use and enjoy services provided at those places, and thus to the extent barriers on the website impinges on the plaintiff's ability to access such benefits at a physical premises, the claim can be actionable under a nexus theory.  (See *Robles*, *supra*, 913 F.3d at pp. 904-906; *Gil*, *supra*, 242 F.Supp.3d at pp. 1320-1321; *National Federation of the Blind v. Target Corp.* (N.D.Cal. 2006) 452 F.Supp.2d 946, 951-956 (*Target*); *Gomez v. Bang & Olufsen Am., Inc*., (S.D.Fla., Feb. 2, 2017, No. 1:16-CV-23801) 2017 WL 1957182, at p. *3.)  The rationale underlying the adoption of this nexus standard mirrors many of the public policies discussed by the courts in adopting the broader view that all websites are directly subject to the ADA, e.g., that Congress would have intended this result given the growing importance of websites for consumers and businesses.  (See *Target*, at p. 955 [contrary interpretation would "effectively read[ ] out of the ADA the broader provisions enacted by Congress"].)

The first California appellate decision on the ADA website-coverage issue was filed while this appeal was pending.  (*Thurston v. Midvale Corp.* (2019) 39 Cal.App.5th 634 (*Thurston*).)  In *Thurston*, a blind woman sued a restaurant for disability discrimination under the Unruh Civil Rights Act for maintaining a website that was

18

incompatible with her screen reading software. (*Id.* at pp. 636-638.) The *Thurston* court upheld a summary judgment in the plaintiff's favor on her ADA violation claim based on the majority nexus theory, and thus found it unnecessary to reach whether it agreed with the more expansive view that all websites are "public accommodations" under the ADA.[7] (*Id.* at pp. 642-646.) In adopting the nexus standard, the court noted that neither the United States Supreme Court nor California Supreme Court have ruled on the issue and in the absence of such controlling authority, a California Court of Appeal may " 'make an independent determination of federal law.' " (*Id.* at p. 640.)

### B. *Analysis*

Martinez argues that this court should adopt the broader view that a website falls within the ADA's definition of a public accommodation as a matter of law and therefore his complaint satisfies the public accommodation element of his ADA claim. Martinez alternatively urges us to reverse the judgment based on a finding that he has sufficiently alleged facts to come within the nexus theory.

---

[7]     The *Thurston* court identified a third view—that even with a showing of a nexus, a plaintiff cannot recover for unequal access to a website—citing the Third Circuit's decision in *Ford*, *supra*, 145 F.3d 601. (See *Thurston*, *supra*, 39 Cal.App.5th at p. 640.) However, a close reading of the *Ford* decision and later authority clarifies that the Third Circuit follows the majority nexus view. (See *Mahoney*, *supra*, 2020 WL 212010, at p. *2 [" 'Third Circuit has held . . . the ADA applies to services and privileges of a place of public accommodation as long as there is "some nexus between the services or privileges denied and the physical place . . . as a public accommodation." ' "]; *Walker v. Sam's Oyster House, LLC* (E.D.Pa., Sept. 18, 2018, No. CV 18-193) 2018 WL 4466076, at p. *2; *McGann v. Cinemark USA, Inc.* (3rd Cir. 2017) 873 F.3d 218, 229; *Menkowitz*, *supra*, 154 F.3d at pp. 120, 122; see also *Target*, *supra*, 452 F.Supp.2d at p. 954.)

19

Credit Union counters that we should determine a website is not a public accommodation as a matter of law and reject the nexus theory (arguing *Thurston* was wrongly decided), and thus determine Martinez cannot state a claim under any factual circumstances. Credit Union alternatively contends that if the nexus theory is applicable, Martinez's alleged facts do not bring his case within that theory.

We first find unmeritorious Credit Union's position that we should reject the nexus theory. Credit Union cites no relevant authority supporting this position. As discussed, virtually all of the courts adopting the majority view that a website is not a "public accommodation" under the ADA have also recognized ADA Title III liability can attach if the plaintiff shows a connection between the alleged disability discrimination on a website and the plaintiff's ability to access and/or enjoy the benefits of the entity's physical location.

*Northwest*, *supra*, 2018 WL 2933407, relied upon by the trial court and Credit Union, does not support a contrary rule. In dismissing the visually impaired plaintiff's claim against a credit union for ADA website deficiencies, the *Northwest* court did not discuss or even mention the nexus standard, and instead relied on another district court decision holding that a chatroom was not a " 'place of public accommodation' " because it was not a physical space. (*Id.* at p. *2, citing *Noah v. AOL Time Warner, Inc.* (E.D. Va. 2003) 261 F.Supp.2d 532.) However, because there was no claim in *Noah* that the chat room had any nexus to a physical facility, the *Noah* court did not reach the nexus issue. Accordingly, neither *Northwest* nor *Noah* provides useful guidance on the nexus issue.

20

We agree instead with each of the courts specifically addressing the issue that the nexus test governs if the ADA is construed to define a public accommodation to include only a physical place. (See, e.g., *Robles*, *supra*, 913 F.3d at pp. 904-906; *Thurston*, *supra*, 39 Cal.App.5th at pp. 642-644; *Gil*, *supra*, 242 F.Supp.3d at pp. 1320-1321.) As stated by the *Thurston* court, " ' "The statute applies to the services *of* a place of public accommodation, not services *in* a place of public accommodation. To limit the ADA to discrimination in the provision of services occurring on the premises of a public accommodation would contradict the plain language of the statute." ' " (*Thurston*, at p. 642, quoting *Robles*, at p. 905.) Moreover, a narrower construction would defeat the purposes of the ADA. "The ADA is a remedial statute and as such should be construed broadly to implement its fundamental purpose of eliminating discrimination against individuals with disabilities." (*Thurston,* at pp. 642-643.) We would be undermining this purpose if we were to conclude that under no circumstances can discrimination on a website be actionable regardless of the connection between the discrimination and the place of public accommodation.

The nexus rule is further consistent with the ADA provision requiring an entity to provide "auxiliary aids" necessary to ensuring equal access for disabled individuals. (§ 12182(b)(2)(A)(iii).) The implementing regulation requires that a "public accommodation . . . take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals *because of the absence of auxiliary aids and services*, unless the public accommodation can demonstrate that taking those steps would fundamentally alter

21

the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden, i.e., significant difficulty or expense." (28 C.F.R. § 36.303(a), italics added.)  The regulation further clarifies that a public accommodation must "*furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities*."  (28 C.F.R. § 36.303(c)(1), italics added.)  Under this rule, "auxiliary aids and services" include "accessible electronic and information technology" and "other effective methods of making visually delivered materials available to individuals who are blind or have low vision."  (28 C.F.R. § 36.303(b)(2).)  The regulation identifies a "screen reader" as an "[e]xample[ ]" of an "auxiliary aid."  (*Ibid.*)

These federal mandates requiring that a "public accommodation" ensure that its services are communicated and made available to disabled persons including by technical means (absent undue burdens or changes to the fundamental nature of the business) strongly support the application of the nexus theory if a public accommodation is defined as a physical place, i.e., that courts must consider the connection between a public accommodation and its website when evaluating whether the ADA applies to deficiencies on a website that make it more difficult for a disabled person to access the defendant's products and services.

Having found the nexus theory applicable if a public accommodation is defined as a physical place, we next turn to the issue whether Martinez alleged sufficient facts to trigger liability under the nexus theory.

22

The courts have not been consistent in defining the scope of the nexus requirement. (See *General Nutrition*, *supra*, 323 F.Supp.3d at p. 1375 ["While courts agree a nexus is necessary, few have defined the nexus precisely."].) But most courts have interpreted the requirement broadly to conclude that a plaintiff has made the requisite showing if the facts show the website "connect[s] customers to the goods and services of [the defendant's] physical" place. (*Robles*, *supra*, 913 F.3d at pp. 905-906; *Thurston*, *supra*, 39 Cal.App.5th at pp. 644-646; see *General Nutrition*, at p. 1376; see also *Castillo*, *supra*, 286 F.Supp.3d at pp. 878-881.) We agree with this standard. Because the nexus test presupposes that Congress did not intend ADA to apply directly to a website, courts applying the nexus test consider whether the alleged website deficiencies impinge on the plaintiff's ability to have equal access to, and enjoyment of, the products and services offered at the physical location. This standard requires a court to focus on the connection between the website and the goods and services offered by the defendant.

*Robles* and *Thurston* both applied this standard to uphold a visually impaired plaintiff's ADA claim against a restaurant. The *Robles* court found the plaintiff alleged sufficient facts to show the requisite nexus in her action against Domino's Pizza based on allegations that Domino's website (and related "app") permitted the customer to find the location of the nearest restaurant and is the primary means of ordering pizzas "to be picked up at or delivered from Domino's restaurants." (*Robles*, *supra*, 913 F.3d at p. 905.) The *Thurston* court found the nexus test was satisfied by facts showing the restaurant's website provided consumers with the opportunity to review the menu and

23

make a reservation, which the court found *expedited the customer's ability to obtain the benefits of the restaurant's physical facility*. (*Thurston*, *supra*, 39 Cal.App.5th at pp. 638, 645-646.) *Thurston* explained these website features "speed[ ] up" the customer's "experience at the physical location" and thus facilitate the use and enjoyment of the services offered at the restaurant. (*Id.* at p. 645.) The court further stated the nexus test was met even though the website was not necessarily an "extension" of the restaurant's physical services (*id.* at pp. 644-645) because, as in *Robles*, "the *website connects customers to the services of the restaurant*" (*id.* at p. 646, italics added).

Closer to the circumstances here, three federal district courts found the nexus test was satisfied in an action by a visually impaired plaintiff against a credit union for a website containing defects similar to those alleged here. (See *Carroll v. FedFinancial Federal Credit Union* (E.D.Va. 2018) 324 F.Supp.3d 658 (*FedFinancial*); *Jones v. Fort McPherson Credit Union (*N.D.Ga. 2018) 347 F.Supp.3d 1351 (*Fort McPherson)*; *Jones v. Piedmont Plus Federal Credit Union* (N.D.Ga. 2018) 335 F.Supp.3d 1278 (*Piedmont Plus*).)

In *FedFinancial*, the court found the nexus test satisfied based on the plaintiff's allegations that the credit union's website "is a service of Defendant's physical, brick and mortar location," and " 'provides access to [the credit union's] array of services, privileges, advantages, and accommodations including, but not limited to, a branch locator for the [credit union's] facility, shared branch locations, and ATMs so that a potential customer may determine from the website the closest location for them to visit, descriptions of its types of banking services and accounts, online banking and bills pay

24

services, loan information and documents, location service hours, special offers, an "About" page so that users may determine [the credit union's] services . . . and qualifications for membership.' Plaintiff . . . also alleged that the access barriers on Defendant's website . . . prevented him from . . . visiting Defendant's physical location." (*FedFinancial*, *supra*, 324 F.Supp.3d at pp. 666-667.)

In finding these allegations sufficient, the *FedFinancial* court rejected the credit union's argument that the nexus test was not met because the plaintiff did not allege he was " 'require[d] . . . to do business with [the credit union] only over its website' " or that the use of the website was "necessary . . . to facilitate the use of the [credit union's] brick-and-mortar places." (*FedFinancial, supra,* 324 F.Supp.3d at p. 667.) The court reasoned that the credit union was "mischaracteriz[ing] the harm alleged by Plaintiff. Plaintiff has alleged that the accessibility barriers on Defendant's website prevent him from acquiring full information about Defendant's services. . . . And Defendant's argument ignores the fact that Plaintiff has been denied equal access to information that would enable him to visit Defendant's brick-and-mortar location." (*Ibid.*)

In *Fort McPherson*, the court likewise found the nexus test satisfied based on the plaintiff's allegations that the credit union's website "allows users to find the physical location of Defendant's facility, provides information about Defendant's services (including twelve online calculators), advantages, accommodations, and amenities, and enables visitors to the website to 'pre-shop' before visiting the physical location to purchase a mortgage." (*Fort McPherson*, *supra*, 347 F.Supp.3d at p. 1354.) Similarly, the *Piedmont Plus* court found the nexus test was satisfied based on the plaintiff's

25

allegations that the website provides " 'information concerning [Defendant's] locations it operates [and] information and descriptions of its amenities and services, privileges, advantages, and accommodations,' and it 'allowed users to find the locations for them to visit.' " (*Piedmont Plus*, *supra*, 335 F.Supp.3d at p. 1282.)

Other courts have similarly applied the nexus test to ADA website accessibility claims asserted against other types of businesses. (See, e.g., *Haynes*, *supra*, 741 Fed.Appx. at pp. 753-754 [nexus requirement met based on allegations store's website allowed customers to locate physical store locations, purchase gift cards online, and access information about goods and services and accommodations of the donut shops]; *Gil*, *supra*, 242 F.Supp.3d at pp. 1320-1321 [finding blind plaintiff satisfied nexus theory by alleging grocery/pharmacy chain's website allows customers to locate physical store locations and fill/refill prescriptions for in-store pickup or delivery]; *General Nutrition*, *supra*, 323 F.Supp.3d at pp. 1375-1376 [nexus test met where website "operates as a gateway to physical stores," including that "website . . . provid[es] a store locater"; permit[s] customers to "purchase products remotely"; and provides "information about store" and "product promotions and deals"].)

Guided by these decisions and the policies underlying the nexus standard, we determine Martinez's allegations are sufficient to bring his case within this standard. Martinez alleged the manner in which the Credit Union's website was formatted precluded him from using his screen reading software to allow him to read the website's content. He alleged this defect precluded him from determining what is on the website, looking for the Credit Union locations, "check[ing] out" the services, and determining

26

which location to visit. He alleged that he could not "effectively browse for Defendant's locations, products and services online." He claimed that if the website were accessible, he could "independently investigate services and products, and find the locations to visit via Defendant's website as sighted individuals can and do."

These allegations are sufficient to show the requisite nexus between the website and Credit Union's physical locations. As in *Robles*, *Thurston*, *FedFinancial*, *Fort McPherson*, and *Piedmont Plus*, the allegations support that Credit Union's website connects customers to the goods and services offered at Credit Union's physical locations. Although the Domino's website in *Robles* was more heavily integrated with the physical locations than what is alleged here because it was a critical tool for ordering the product (a pizza), Martinez's allegations are similar to the allegations found sufficient to establish a nexus in *Thurston*, *FedFinancial*, *Fort McPherson*, and *Piedmont Plus*. In each of those cases, the website was not necessary to obtaining the goods and services offered by the defendant, but it facilitated the customer's experience by providing information and making it easier (faster, more efficient, and/or more effective) for the customer to locate the physical facility and to understand and access the products and services offered at the defendant's location. Similarly here, Martinez alleged the Credit Union's website permits the customer to research and prepare before going to the physical facility, including to make informed decisions about its products and services and thus to have full and equal access to the entity's offerings.

To the extent Martinez's pleading was not as detailed as in *FedFinancial*, *Fort McPherson*, and *Piedmont Plus*, Credit Union never brought a timely pleading challenge

27

that would have permitted Martinez the opportunity to amend his complaint to provide more detail. The record supports that Credit Union had the full opportunity to conduct discovery to obtain more specific information on the allegations and relevant factual issues. Thus, any challenge now to the lack of specificity in the complaint is unavailing.[8]

Arguing the allegations do not satisfy the nexus standard, Credit Union relies on *Price v. Everglades College*, *Inc*. (M.D.Fla., July 16, 2018, 6:18-cv-492-Orl-31GJK) 2018 WL 3428156 (*Everglades*), in which the federal district court found the plaintiff's allegations were insufficient to show the required nexus. There, the visually impaired plaintiff alleged the defendant's administrator told him he could find information about the college on the website, but when he went to the website, it was not compatible with screen reading software, thus allegedly preventing him from learning about the application process; researching available degree types, prerequisites, and course descriptions; viewing the course catalog; and obtaining information about living arrangements that could accommodate his disability. (*Id.* at p. *1.)

In finding these allegations inadequate to establish the required nexus, the court relied on two other unpublished Eleventh Circuit district court decisions that distinguished between "an inability to use a website to gain information about a physical location" from the "inability to use a website that impedes access to enjoy a physical

---

8    We note "[w]hether a particular facility is a 'public accommodation' under the ADA is a question of law." (*Jankey v. Twentieth Century Fox Film Corp.* (C.D.Cal. 1998) 14 F.Supp.2d 1174, 1178.) On remand, the court's determination on this issue will depend on proof of Martinez's allegations.

location," and had found the former to be " 'insufficient to state a claim.' " (*Everglades*, *supra*, 2018 WL 3428156, at p. *2.) The *Everglades* court stated "a contrary finding would require all websites with *any* nexus to a physical public accommodation to be formatted in such a way that they are accessible to screen reader software," and that, as with other courts, it was "unwilling to take a leap with such far-reaching implications." (*Ibid.*) The court further found the plaintiff alleged "only facts indicating that his ability to gain information about the location, rather than his access to enjoyment of the university itself, was compromised," noting "the Plaintiff does not claim that he was unable to apply to the university, pay tuition, or use the student portal on the website." (*Ibid.*)

We are unconvinced by *Everglades*'s reasoning. First, the plaintiff's allegations did reflect his inability to obtain critical information necessary to decide whether to apply and/or enroll in the college, and thus, in our view, the allegations supported that the website deficiencies precluded his " 'access to enjoy the physical university.' " (*Everglades*, *supra*, 2018 WL 3428156, at pp. *1-*2.) Second, the *Everglades* court based its holding on its conclusion that a plaintiff must allege the challenged website is a *necessary tool* for obtaining access to the college's facilities. This rule is contrary to the majority position and would improperly exclude ADA coverage for many vital services that aid in connecting individuals to a business's physical site. Third, we find unpersuasive the *Everglades* court's concern that broadly interpreting the nexus standard would mean "all websites with *any* nexus to a physical public accommodation" would be required to be accessible to screen reader software. (*Id.* at p. *2.) The fact that many

29

disabled plaintiffs challenging an inaccessible website would be successful in showing the required nexus derives from the fact that websites often provide important tools to connect customers to a physical place. That is a primary reason for many websites. Depriving a person with a covered disability from access to such an essential amenity is precisely the inequity the ADA was enacted to prevent.

Because we have concluded Martinez's allegations were sufficient to satisfy the nexus standard, we do not reach the legal issue whether the ADA applies to websites even without a nexus to a physical place. We must reverse a judgment on the pleadings if the plaintiff has stated a cause of action on any legal theory (*Rossberg*, *supra*, 219 Cal.App.4th at p. 1490), and an appellate court generally will not address an issue unnecessary to the resolution of the appeal (*Young v. Three for One Oil Royalties* (1934) 1 Cal.2d 639, 647-648; *Oxbow Carbon & Minerals, LLC v. Dept. of Industrial Relations* (2011) 194 Cal.App.4th 538, 552, fn. 11; see *Robles*, *supra*, 913 F.3d at p. 905, fn. 6 [declining to decide broader issue where requisite nexus found]; *Thurston*, *supra*, 39 Cal.App.5th at p. 644 [same]).

C. *Other Asserted Grounds for Affirming the Dismissal of the Complaint*

Credit Union contends that if we find Martinez sufficiently alleged that the ADA applies to its website, we should affirm the dismissal on the ground that courts have no jurisdiction to require a private entity to alter its website to comply with the ADA because the United States Congress has the exclusive role to establish website standards, and Congress has not established such standards. Credit Union maintains that "if Congress intended to regulate the [I]nternet" to require visually impaired individuals to

30

be able to "read" websites, "it should have spoken clearly on the subject," and that "[i]t is inappropriate for the Court—almost 27 years after the passage of the ADA—to announce sudden, new regulation of an industry (online commerce) that has existed for years."

The argument is factually and legally unsupported.

First, Martinez is not asking the trial court to impose a "sudden" or "new" regulation on the "online commerce" industry. The statutory and regulatory rules have long mandated that a "public accommodation" ensure that its online services are made available to disabled persons (absent undue burdens or changes to the fundamental nature of the business). (See *Robles*, *supra*, 913 F.3d at p. 907 ["at least since 1996 Domino's has been on notice that *its online offerings* must effectively communicate with its disabled customers and facilitate 'full and equal enjoyment' of Domino's goods and services"]; see also *Target*, *supra*, 452 F.Supp.2d at p. 956 [court holding in 2006 that national retailer's website may violate Title III if its inaccessibility "impedes the full and equal enjoyment of goods and services offered" at its stores].) Consistent with this conclusion, the existing DOJ regulations state a public accommodation must provide "auxiliary aids and services" to ensure "effective communication" with disabled persons (28 C.F.R. § 36.303(a), (c)(1)), and that these requirements may include "screen reader software . . . or other effective methods of making visually delivered materials available to individuals who are blind or have low vision" (28 C.F.R. § 36.303(b)(2)). These regulations also require this assistance to "*be provided in accessible formats*, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." (28 C.F.R. § 36.303(c)(1)(ii), italics added.)

31

Additionally, Martinez is not seeking to "regulate" the entire "online commerce" industry. Rather, he seeks an injunction requiring *Credit Union* to "take the steps necessary" to make *its own website* "accessible to and usable by visually-impaired individuals," and limits any requested remedial measures to $50,000.

Further, we find unavailing Credit Union's legal contention that the alleged defects in its website can be remedied only by Congress's enactment of a specific website accessibility standard. The argument is inconsistent with the fundamental principle that a legislature has the authority to enact general laws and delegate enforcement issues to a regulatory body and/or to leave it to the judicial branch to interpret the law and determine whether the party has complied in the particular case. (*See Marbury v. Madison* (1803) 5 U.S. 137, 177 [discussing role of the judiciary under separation of powers, and concluding "[i]t is emphatically the province and duty of the judicial department to say what the law is"].) This is particularly true with respect to the ADA, which often requires a flexible approach to enforcement. (*Robles*, *supra*, 913 F.3d at p. 908.) " '[T]he ADA and its implementing regulations are intended to give public accommodations maximum flexibility in meeting the statute's requirements. This flexibility is a feature, not a bug,' " of the statutory scheme. (*Ibid.*; *see Andrews*, *supra*, 268 F.Supp.3d at p. 403 [ADA's antidiscrimination standards "are meant to be applied contextually and flexibly"].)

Credit Union relies on *Marsh v. Edwards Theater Circuit, Inc.* (1976) 64 Cal.App.3d 881 for a rule that only a legislature can determine appropriate accessibility standards. *Marsh* is inapposite. *Marsh* involved architectural barriers (theatre seating) that existed long before the laws requiring enhanced protections for

32

disabled individuals, and the court interpreted statutes applicable before the enactment of the ADA and before the current version of the Unruh Civil Rights Act. (*Id.* at pp. 886-892; see *Flowers v. Prasad* (2015) 238 Cal.App.4th 930, 941, fn. 8.)

Credit Union also relies on a line of United States Supreme Court decisions in which the court found certain administrative rules (arising in other contexts such as greenhouse gas, tobacco, telephone regulations) to be beyond the agency's delegated powers. (See, e.g., *MCI Telecommunications Corp. v. American Tel. & Tel. Co.* (1994) 512 U.S. 218, 231; *FDA v. Brown & Williamson Tobacco Corp.* (2000) 529 U.S. 120, 146; *Gonzales v. Oregon* (2006) 546 U.S. 243, 267; *Util. Air Regulatory Group v. EPA* (2014) 573 U.S. 302.) This issue is not before us because it is undisputed the DOJ has the delegated authority to promulgate regulations on website accessibility. (§ 12186(b); see *Robles*, *supra*, 913 F.3d at p. 903, fn. 2.) And the fact that the DOJ has not yet issued specific regulations does not bar the courts from addressing these issues. (*Robles*, at pp. 909-911; *Thurston*, *supra*, 39 Cal.App.5th at p. 654.)

In this regard, *Robles* and *Thurston* recently rejected arguments that a court should abstain from ruling on an ADA website claim because the DOJ has not identified specific standards for website accessibility compliance. (*Robles*, *supra*, 913 F.3d at pp. 909-911; *Thurston*, *supra*, 39 Cal.App.5th at p. 654.) The *Robles* court stated: "Our Constitution does not require that Congress or DOJ spell out exactly how [a private entity] should fulfill its obligation" that its website provide "effective communication and facilitate 'full and equal enjoyment' of [its] goods and services to its [disabled] customers . . . ." (*Robles*, at p. 909.) The court further observed: "[T]he application of the ADA to the

33

facts of this case are well within the court's competence.  Properly framed, the issues for the district court to resolve on remand are whether [the defendant's] website and app provide the blind with auxiliary aids and services for effective communication and full and equal enjoyment of its products and services.  Courts are perfectly capable of interpreting the meaning of 'equal' and 'effective' and have done so in a variety of contexts.  In addition, if the court requires specialized or technical knowledge to understand [the plaintiff's] assertions, the parties can submit expert testimony.  [Citations.]  Whether [the defendant]'s website and app are effective means of communication is a fact-based inquiry within a court's competency."  (*Id*. at pp. 910-911.)

We concur with this reasoning.  (See *Thurston*, *supra*, 39 Cal.App.5th at pp. 654-655 [agreeing with "the Ninth Circuit's recent rejection of the [abstention] doctrine to a lawsuit involving a website and app alleged to be inaccessible under the ADA" and finding the trial court's consideration of issues involving the scope of an injunction "well within the court's competence to administer"].)

Finally, we comment briefly on Credit Union's lengthy discussion in its appellate briefs about its subjective concerns with the Accessibility Guidelines (the online industry's current accessibility standards, sometimes called WCAG 2.0).

First, the discussion is based on facts that are not properly before us.  In reviewing a judgment on the pleadings, we are limited to examining the factual allegations and any matter for which judicial notice may be taken.  (*Cloud v. Northrop Grumman Corp*. (1998) 67 Cal.App.4th 995, 999.)  In challenging the Accessibility Guidelines, Credit Union relies on facts and sources of information that are not contained in the

34

pleadings and are outside the appellate record, and for which it never sought judicial notice.

Second, the assertions are not ripe as they concern the remedies issues that the court has not yet addressed. (See *Robles*, *supra*, 913 F.3d at p. 908; *Reed v. CVS Pharmacy, Inc.* (C.D.Cal., Oct. 3, 2017, No. CV 17-3877-MWF (SKx)) 2017 WL 4457508, at p. *4.) In his complaint, Martinez alleged the manner in which Credit Union formats its website prevents "free and full use by blind persons using screen reading software"; compliance with online industry standards would make Credit Union's website accessible to blind and visually impaired persons; these "guidelines are successfully followed by numerous large business entities to ensure their websites are accessible"; and that without the "basic components" identified in the guidelines, a website will be inaccessible to a blind or visually impaired person using a screen reader.

These allegations are sufficient to support that if Martinez proves an ADA violation, there are alleged workable and legally enforceable remedies that would address the ADA violations. In reaching this conclusion, we do not suggest the Accessibility Guidelines create a particular legal standard for ADA compliance. But Martinez's pleading does not seek to impose liability based solely on Credit Union's failure to comply with the Accessibility Guidelines; rather he seeks to impose liability on the Credit Union for failing to comply with provisions of the Unruh Civil Rights Act and the ADA. Although the Guidelines may be admissible for limited purposes, such as showing the feasibility of remedying the defects in the website or to assist in preparing a workable injunction if Martinez proves his claim, Martinez's cause of action is not necessarily

35

dependent on the viability or validity of the Guidelines. (See *Thurston*, *supra*, 39 Cal.App.5th at pp. 646-648.) During the hearing on the motions in limine, counsel stated their intent to present expert testimony on the technical website issues, and the court may rely on that evidence to determine an appropriate remedy if liability is proven.[9]

Additionally, to the extent Credit Union is suggesting that any remedy would be overly burdensome, this argument is not the basis for a pleading challenge. As Credit Union acknowledged in its trial brief, such claims constitute affirmative defenses. (See *Andrews*, *supra*, 268 F.Supp.3d at p. 404; *Brooklyn Center for Independence of Disabled v. Bloomberg* (S.D.N.Y. 2013) 980 F.Supp.2d 588, 657.) Moreover, what is reasonable, unduly burdensome, or a fundamental alteration depends on the particular facts and circumstances of the case. (See *Andrews*, at p. 404; see also *Staron v. McDonald's Corp.* (2d Cir. 1995) 51 F.3d 353, 356.)

### III. *Motions For Judicial Notice*

Martinez brought two motions for judicial notice. In the first motion, he asked that we take judicial notice of (1) the DOJ's Statement of Interest filed in May 2012 in a case brought by the National Association of the Deaf in a Massachusetts federal district court (*see Netflix*, *supra*, 869 F.Supp.2d at p. 199); and (2) three unpublished Central

---

[9] Many, if not most, of Credit Union's challenges to the *Thurston* decision involve its conclusions on remedies and the scope of the issued injunction. That case was at a different stage than here (granting summary judgment in the disabled plaintiff's favor), and thus we do not reach these arguments. We likewise do not address Credit Union's comments about standing issues, which Credit Union admits are not before us on this appeal. (See Respondent's Brief at p. 36 ["the issue of standing is not presently before the Court"].)

36

District of California federal court orders filed in 2014 and 2015 discussing the DOJ's position on ADA website coverage and/or reflecting the court's adoption of the "nexus" theory.

We decline to take judicial notice of these materials as unnecessary to the resolution of the appellate issues before us.

With respect to the DOJ's 2012 Statement of Interest, we have already noted (based on statements in published federal cases) that the DOJ has been historically generally supportive of ADA website accessibility but has declined to issue specific regulations (see fn. 5, *ante*).  We do not find that the DOJ's single statement in one particular case eight years ago adds helpful or material information on this point or to our analysis.

With respect to the unpublished federal district court decisions, two of the orders are available on an online platform (e.g., Westlaw) and therefore judicial notice is unnecessary.  (See *Jaramillo v. County of Orange* (2011) 200 Cal.App.4th 811, 817-818.)  As reflected in our opinion, we have reviewed various unpublished federal district court decisions, and can do so without specifically taking judicial notice of each decision.  (*Ibid.*; see *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1096, fn. 18.)  With respect to the third order that is not on an available database, the order does not add anything material to our analysis.  As to this and the other proffered federal district court orders, we have considered more recent published Ninth Circuit authority on these same points in reaching our conclusions.

37

In his second motion, Martinez requests that we take judicial notice of a consent decree and several settlement agreements in unrelated cases. This motion was untimely (filed after Credit Union filed its respondent's brief) and contains information unnecessary to our analysis and determination in this case. We thus decline to grant the motion.[10]

DISPOSITION

Judgment reversed. Respondent Credit Union to bear appellant Martinez's costs on appeal.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.

---

[10]     We note additionally that we have consolidated this appeal with an appeal from the same case filed prematurely by Martinez.